CHRISTENSEN v. PUGH et al.

No. 4991. Decided September 12, 1934. (36 P. [2d] 100.)

*E. A. Rogers* and *Allen T. Sanford,* both of Salt Lake City, for appellant.

*Stephens, Brayton & Lowe,* of Salt Lake City, and *De Vine, Howell & Stine,* of Ogden, for respondents.

LARSON, District Judge.

Plaintiff commenced this action in the district court of Salt Lake county against the defendants, seeking a judgment for $12,000 for an alleged conversion of 50,000 shares of stock in the Park-Bingham Mining Company. He alleges in his amended complaint: "That on August 9, 1927, defendants conspired and confederated to cheat and defraud plaintiff out of 50,000 shares of stock in the Park-Bingham Mining Company;" that plaintiff was the owner of 50,000 shares of stock which had been hypothecated to Hogle & Co. for $4,000; that defendant Pugh borrowed said stock from plaintiff to use as security in the purchase by Pugh of more stock in the Park-Bigham Company, and advanced to plaintiff's

use $3,000 to redeem the stock from Hogle; that Pugh then turned the stock over to defendant Porter, who hypothecated 40,000 shares of it for $5,000 and used the money for his own purposes; that defendants sold 10,000 shares for $3,000; that the stock, at the time of the loan, was worth 30 cents per share; that defendants, when they borrowed the stock, did not intend to use it as collateral in the purchase of more stock. The agreement between the parties was evidenced by a writing as follows:

"This is to certify that I, undersigned, have this date, August 9, 1927, borrowed from A. C. Christensen, 50,000 shares of Park-Bingham Mining stock, with the understanding that the same may be used by me as collateral in buying additional Park-Bingham Mining stock. It is further agreed that I will not borrow in excess of 12½ cents per share on the stock borrowed from A. C. Christensen or the stock purchased by me during such time as I owe A. C. Christensen any of above stock. I further agree to return said 50,000 shares of stock, or any part thereof, to A. C. Christensen within thirty days of written demand of A. C. Christensen or his heirs or executors, together with the payment to me of the sum of $4,000.00 in cash. The cash is to reimburse me for the like sum of $3,000.00 I have this day advanced to A. C. Christensen.

"I also agree that in case of failure to return stock on demand as above stated, that A. C. Christensen or agents shall have the right to take up any and all stock held by me including the 50,000 shares borrowed and to sell such portion of the stock as is necessary to reimburse him for the money so expended in doing so, after paying A. C. Christensen the 50,000 borrowed—any remaining shares of stock shall be turned over to the undersigned, his heirs or executors.

"Signed and executed this 9th day of August, 1927.

"[Signed]  Dave J. Pugh.

"Witness: [Sgd] F. E. Porter, Sr. F. E. Porter, Jr."

Plaintiff does not allege that any demand was made on defendants for a return of the stock, does not allege any tender of the $3,000 advanced by defendants to plaintiff, and does not allege that defendants refused to deliver the stock or that defendants were unable to deliver the stock to the plaintiff.

Defendants' general demurrers to the amended complaint were sustained by the court, plaintiff refused to plead further, and the action was dismissed. From the order sustaining the demurrers and dismissing the action, plaintiff prosecutes this appeal. Plaintiff seeks a reversal of the trial court upon the following grounds: The loan of the stock to Pugh constituted a bailment, and a conversion of the stock is shown or alleged in two ways: First, that, at the time the property was bailed to defendants, they intended to use it for purposes other than those specified in the bailment, and therefore, as soon as possession was obtained by defendants, this intention constituted a conversion ab initio; and, second, that the acts of the defendants in using the stock for purposes other than that of pledging it to a broker as security for buying other Park-Bingham stock on a margin constituted and completed a conversion of the stock ipso facto, and rendered demand for possession or refusal to deliver unnecessary as a preliminary to suit.

Plaintiff's contention, that possession of the property was obtained with a fraudulent intent and therefore without further act by the defendants and without any misuse of the property or the purposes for which it was bailed, conversion would lie at the instance of the bailor is untenable. A bailee may obtain property on certain representations intending to abuse his trust and otherwise use the property or convert it, but before doing so he listens to the still small voice, repenteth of his evil heart, and observes his trust, guards the property, and is at all times able and willing to return it, yea, and does return it or tender its return. Shall the bailor then be permitted to say that, "As a man thinketh, so hath he done," set up a legal fiction that his property has been destroyed or damaged or his right of property therein interfered with and recover for a conversion? It may be true "that out of the abundance of the heart the mouth speaketh," but it is also true that "thoughts unexpressed may sometimes fall back dead." A mere irregular, fraudulent, or wrongful transfer of possession does not

constitute a conversion, nor will a mere intent to convert sustain an action in trover; the intent must be accompanied by a positive act. 38 Cyc. 2010, and cases cited. Conversion is any unauthorized act of dominion or ownership exercised by one person over the personal property of another in denial of his right in the property, or inconsistent with it. Cooley on Torts (4th Ed.) § 331. The most frequently quoted definition is that in 2 Greenleaf on Evid. § 642:

> Conversion consists either in the appropriation of a thing to the party's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it, in exclusion or defiance of the owner's right, or in withholding the possession of the property from the owner under a claim of title inconsistent with his own."

Under all the authorities where transfer of possession was had by the owner's consent, even though under misrepresentation as to the purpose for the transfer, until some act is done by the bailee which is a denial, or violation, or disregard, of the owner's rights in the property, conversion will not lie. The gist of conversion is not the acquisition of property by a wrongdoer, but the wrongful deprivation of it to the owner. *State* v. *Omaha National Bank*, 59 Neb. 483, 81 N .W. 319; *McPheters* v. *Page*, 83 Me. 234, 22 A. 101, 23 Am. St. Rep. 772; 38 Cyc. 2004.

It is well settled that, if the owner consents to the taking (the transfer of possession) of his property, he cannot recover for a conversion unless the terms under which the transfer was made are violated. In this action plaintiff pleads that he delivered, or caused to be delivered, to defendant Pugh the property in question, to be used by Pugh as collateral in Pugh's deal and business, for Pugh's benefit, and not for plaintiff's use, business, or benefit. The transfer of possession was a willful and voluntary act of the plaintiff, and he cannot now assert that Pugh obtained possession in defiance of his title or his right of possession, and so maintain an action in conversion, simply because Pugh may have had ulterior motives. It follows, therefore, that plaintiff's first ground of conversion fails.

Plaintiff next contends that Pugh became bailee for a specific purpose, to wit, to use the stock by pledging it to enable the defendant Pugh to buy more stock of the Park-Bingham Mining Company, and, when he permitted Porter to pledge 40,000 shares for $5,000 and sold 10,000 shares, this was a violation of his trust and amounted to a conversion. This brings up two questions: (a) What was the extent of Pugh's power and authority under the contract by which he obtained possession of the stock? and (b) Was a demand and tender necessary on the part of plaintiff before he could maintain this action?

Conversion of property by a bailee may be committed in two ways: (1) By acts in derogation of the bailor's title; and (2) by acts in derogation of bailor's possessory rights. In other words, the bailee may be guilty of conversion by converting the property to the bailee's own use, that is, by using the property in a way unauthorized by the terms of the bailment and in defiance or derogation of the owner's title; or by delivering the property to some one other than the bailor or owner in violation of the terms of the bailment and in derogation of the bailor's right to the possession or by refusing to redeliver to the bailor at the expiration or completion of the bailment.

Does the amended complaint allege facts sufficient to show a violation of the bailment in either of these ways? Are sufficient facts alleged to show a denial by Pugh of Christensen's title or a violation of Christensen's right to repossession of the property at the conclusion or fulfillment of the terms and purposes for which the property was bailed? In this connection the plaintiff alleges: That after receipt of the stock from Hogle and the payment by Pugh of $3,000 to the benefit of the plaintiff, as provided in the agreement, "Pugh turned said 50,000 shares of stock over to F. E. Porter, who at once hypothecated 40,000 shares thereof for $5,000.00," and plaintiff, "on information and belief, alleges that defendant sold 10,000 shares for $3,000.00." That is the whole of the allegation

as to the use or disposition made of the stock by the defendants. Clearly this does not allege facts which constitute a violation of the contract to the extent of denying plaintiff's title or in derogation of his possessory rights. The contract clearly specifies that Pugh may part with the possession of the stock, and may pledge the stock as collateral in the purchase of more stock to the amount of 12½ cents per share. In fact, he borrowed it for that purpose. That which Pugh could do by himself he could do by his agent; no matter of special skill being involved. If Porter and Pugh were not in partnership, then that which Porter did, as far as the pleadings show, was done as the agent of Pugh, and was therefore Pugh's act; and Pugh may turn the stock over to Porter as his agent.

But when Pugh turned the stock over to Porter, did he violate the contract of bailment? Four conditions may arise in which the stock could be turned over to Porter as alleged and not be in violation of the contract: (a) It may have been turned over to Porter as Pugh's agent; (b) Porter may have been a party to the bailment as a partner of Pugh; (c) the stock may have been hypothecated to Porter in the purchase of more stock; (d) Porter may have held the stock as security for the $3,000 paid Hogle for the benefit of plaintiff, by Porter, to redeem the stock so that it could be delivered by Christensen to Pugh. As to the first of these propositions, it is clear that whatever Pugh could do with the stock by himself, he could also do by his duly authorized agents. He could deliver the stock to Porter to hold as his agent; he could hypothecate it through Porter as his agent; he could do through Porter anything he could do by himself. There is no allegation in the complaint that Porter was not Pugh's agent, unless it is the statement that Pugh and Porter confederated together, and this statement, if it may be said to show they were not principal and agent, makes them partners in the deal. In either event the mere allegation that the stock was turned over to Porter does not show a violation of the agreement with respect to possession.

If, however, Porter was not Pugh's agent, and was not a partner, plaintiff's contention still cannot prevail. Pugh had authority to pledge the stock. He could pledge it to Hogle, to the broker, to the money lender, or to Porter. The only restriction was that it should not exceed 12½ cents per share, and that it be used in purchasing more stock, but not for plaintiff. The amount for which it was pledged by Porter was exactly 12½ cents per share. It is not alleged that this hypothecation was not made for stock, nor that it was not made to a broker. It is alleged that Porter converted what he received to his own use, but whether what he received was stock he took in his own name or money is not alleged, and, if it was money received when Porter pledged the stock, was the money used in stock purchases for the benefit of Pugh and Porter? It cannot be, and we understand it is not, contended that the new stock was to be purchased in plaintiff's name. In fact, the agreement expressly negatives such an idea.

It appears from the amended complaint that Porter advanced the $3,000 to Hogle, and he would have a lien right on the stock for this amount and the right, if need be, to repledge it to secure the money for Hogle. This could not injure or interfere with plaintiff's rights, nor could he be heard to complain until he tendered back the money he received and for which the stock is security by the express terms of plaintiff's agreement with Pugh. It seems clear, therefore, that no acts are alleged that state a positive violation of the agreement, unless it be the sale of the 10,000 shares for $3,000. As above indicated, the pleading implies that Porter advanced the $3,000 and plaintiff never tendered it back. It is alleged that defendants sold the 10,000 shares, but it does not indicate to whom. It may have been sold by Pugh to Porter for the $3,000 he advanced, and could then, as far as plaintiff is concerned, still be treated as a pledge. It may have been sold by Porter to Pugh. It may have been sold and not delivered because it was not paid for, or it may have been repurchased or reclaimed by Pugh. The

complaint is silent except for the statement that plaintiff is informed and believes defendants have sold the 10,000 shares. Even that is not alleged as a positive fact.

But if the stock were sold to an outside party and the money received by defendants, does that constitute a conversation? In other words, was Pugh under the obligation to return the identical certificates he received from the plaintiff, or could he discharge his liability as bailee by delivering other certificates for 50,000 shares of Park-Bingham stock? Certainly the delivery of the stock under the agreement as set forth did not contemplate that Pugh must return the identical certificates which he received from the plaintiff. To so hold would be to say that it was the paper on which the certificate was printed and not the stock represented thereby that was borrowed. The contract clearly specifies that Pugh may part with the possession of the stock and pledge the stock as collateral in the purchase of more stock; and that, if Pugh fails to return the stock within thirty days after demand and the repayment to defendants of the $3,000, the plaintiff could take up any stock that Pugh owned until he received the 50,000 shares. Suppose Pugh had pledged the stock to a broker and had been unable to redeem it but had other stock in the Park-Bingham Company that was not incumbered to the amount of 50,000 shares. Could it be contended that he was liable in conversion on the theory that the certificates he tendered to Christensen were not the ones he had received? Had Pugh, before suit, tendered to plaintiff certificates representing 50,000 shares of Park-Bingham stock, could plaintiff have been heard to say: "Those are not my certificates, and I will not accept them. I want my old certificate"? Is not one share of stock the equal of another? Would not Pugh have fulfilled his contract by delivering any certificate for the required amount of Park-Bingham stock? The certificate is only the evidence of ownership, and it would make no difference whether the same, or some other, certificate for 50,000 shares should be returned to the plaintiff. The rule

that the identical property must be returned has never been held to apply to shares of stock.

"Where personal property has been wrongfully converted by the bailee, the bailor is entitled to recover his specific property or its value, and cannot be compelled to accept other property of the same kind and of equal value, in lieu of that which was converted, although, of course, there can be no doubt that, if the bailee of personal property sells it in violation of his authority, the owner may ratify the transaction and demand the proceeds of the sale. When applied to stocks, however, it seems that a different rule governs. Thus, if the bailee of a certificate of stock sells the same for his own use, and afterwards tenders to the bailor other like certificates of stock in the same company, which are refused, it seems that the bailee is not liable for converting the stock. The reason for this exception to the general rule is that each certificate of stock is a precise equivalent of every other, it is certain that the bailor could suffer no pecuniary loss by the transaction; while the nature of the property, or rather of his interest in it, forbids the idea that it could be the object of personal attachment, or have a peculiar value in his estimation as contradistinguished from any other equal number of shares in the same company." 3 R. C. L. 112; *Atkins* v. *Gamble*, 42 Cal. 86, 10 Am. Rep. 282.

So the fact that the identical certificates which Pugh received from plaintiff were out of Pugh's hands and perhaps could not be returned does not constitute a conversion.

Although a bailee has not violated his contract with regard to the keeping and use of the property, he may still be liable for conversion if he fails or refuses to return the goods bailed upon expiration of the period or purpose of the bailment or upon proper demand. Plaintiff does not plead a refusal or an inability on the part of the defendants to return the stock, nor does he allege a demand for its return and a failure to comply therewith. His position is that a demand is unnecessary as a condition to maintain this action. It is undoubtedly true that there are cases where a demand is unnecessary, but we know of no case, and we can think of no situation, where a demand for possession or a refusal to deliver is not a requisite to an action for conversion, except where facts are pleaded which

show it impossible for the bailee to deliver or that such a demand would be useless. No such facts are alleged in the amended complaint. There is no allegation that defendants did not, at the time suit was commenced, own and possess in excess of 50,000 shares of Park-Bingham stock; no allegation that they did not have, at the time, the identical stock they received from plaintiff; there is not even a general allegation that they did not own 50,000 shares of stock or that they were unable to make delivery. There is no allegation that plaintiff was entitled to possession of the stock; no allegation that he wanted possession of the stock; no allegation that he would have accepted the stock. In fact, it is very evident from the complaint that the plaintiff did not want his stock back when he commenced this action.

The agreement set forth in the complaint is bilateral; that is, it imposes obligations upon both parties. There is no allegation that plaintiff had performed or tendered performance of his obligation. In fact, his counsel frankly admits that he did not tender performance of his obligation under the contract, did not make demand for the stock, did not give thirty days' notice, and did not pay or tender payment of the $3,000 which had been advanced to him and which the agreement expressly sets forth must be done by Christensen before Pugh is under any obligation to return any of the stock. The contract expressly provides that none of the stock need be returned until the whole sum of $3,000 was paid to defendant Pugh by the plaintiff. The agreement clearly contemplates that Pugh would not always have this stock free in his hands. He borrowed if for the purpose of hypothecating it, and he was given thirty days after demand in which to redeem it or to secure other stock to replace it before he was in default. The agreement further provides that, in case Pugh fails to redeliver the stock, or any part thereof, after thirty days' demand and the payment by plaintiff to Pugh of the $3,000 advanced, the plaintiff may take up any stock owned by Pugh, whether hypothecated or not, until he has received

his 50,000 shares; that, should it be necessary for the plaintiff to expend moneys in redeeming the Pugh stock that was pledged, he may take up and sell enough of Pugh's stock in excess of the 50,000 shares as may be necessary to reimburse him for the moneys so expended. We do not mean to hold that this remedy is exclusive; we are inclined to the view that it is in addition to his right to sue for conversion if the stock were not delivered within the thirty days after notice and the payment or tender by plaintiff of the $3,000 advanced by the defendants, but before plaintiff could exercise either right he would be required to make this thirty-day demand and tender the payment of the $3,000, or plead facts showing that such demand would be unavailable, that defendants had either refused or were unable to comply with the demand if one were made. Plaintiff makes no such contention.

We conclude, therefore, that the complaint did not state facts sufficient to constitute a cause of action against the defendants or either of them, and that the action of the trial court sustaining the demurrer and dismissing the complaint should be and the same is affirmed; costs to respondents.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

MOFFAT, J., being disqualified did not participate.