ASSOCIATED BEAN GROWERS, APPELLEE AND CROSS-
APPELLANT, V. CHESTER B. BROWN COMPANY,
APPELLANT AND CROSS-APPELLEE.

255 N. W. 2d 425

Filed July 6, 1977. No. 41053.

Monen, Seidler & Festersen, for appellant.

James R. Hancock of Hancock & Shaver, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

WHITE, C. J.

This is an action by the plaintiff for a declaratory judgment concerning the defendant's refusal as a public warehouseman to redeliver stored beans. The plaintiff's petition contained two causes of action each relating to a warehouse receipt for 8,419 pounds of Great Northern beans.

The case was tried to the court. On July 19, 1976, the court entered its judgment, finding for the plaintiff. The court found that the plaintiff had delivered to the defendant 8,149 pounds of grade 96 dry, edible Great Northern beans as evidenced by each receipt

and that the plaintiff tendered the receipts to the defendant in exchange for delivery of the beans together with charges for storage, insurance, and receiving in and loading out as noted on the receipts; that the defendant failed to specify any other charges it may lawfully have been permitted to make upon the warehouse receipts which would include processing charges and that the defendant was without lawful authority to impose a processing charge of $8 per cwt., at the time the plaintiff presented the receipts. The court further found that at the time the receipts were presented the defendant had no lawful excuse for nondelivery of the beans and thus converted the property of the plaintiff. The defendant was found liable to the plaintiff for the sum of $6,071.21, which included costs and interest at 6 percent on the value of the beans from February 19, 1974, to July 15, 1976. The defendant filed a motion for a new trial which was overruled, and now appeals. We affirm the judgment of the District Court, as modified, and remand the cause for further proceedings in accordance with this opinion.

The plaintiff is a nonstock cooperative association of bean growers originally formed in 1970 with about 10 members. By 1973 it had approximately 45 members. The defendant, in addition to warehousing dry edible beans, is in the business of buying and selling beans. In the North Platte Valley, in the Panhandle of the state, a variety of white beans, known as Great Northern beans, is grown. About 75 percent of the Great Northern beans produced in the United States are grown in this area where both the plaintiff and the defendant are located.

The plaintiff association markets the beans of its grower members. At the time the events took place which led to this litigation, the plaintiff association had no storage facilities of its own and thus had to store its beans with the existing elevators and public warehouses, such as the defendant. The record

shows that except for the plaintiff association and the NFO to a small extent, the only existing marketing agency for the beans produced in this area were the existing elevators, such as the defendant. Wayne Snyder, sales manager for the defendant, estimated that the defendant company had 40 to 50 percent of the bean business. As can be readily perceived from the above facts, the defendant, while providing services to the plaintiff association in its capacity as a public warehouseman, is also in competition with the plaintiff for the marketing of beans grown in the area.

On October 17, 1973, the plaintiff delivered to the defendant 8,419 pounds of dry, edible Great Northern beans. In return, the defendant issued its warehouse receipt No. 7912 to the plaintiff. On the same day, Ted Daggett, an officer and member of the plaintiff association, delivered an identical amount of beans and was given in return warehouse receipt No. 7911 by the defendant which was subsequently assigned to the plaintiff.

On February 19, 1974, Larry Birdsall, Ted Daggett, and Warren Brashear, all members and agents of the plaintiff association went to the defendant's office in Morrill, Nebraska, and tendered warehouse receipts Nos. 7911 and 7912, along with the specified charges for storage, insurance, and receiving in and loading out shown on the receipts. Wayne Snyder then informed the plaintiff's agents that there was a processing charge due of $8 per cwt. which had to be paid before they would get their beans out. The plaintiff's agents refused to pay this charge, taking the position that since no dollar amount was specified on the receipts for processing they did not owe such a charge. This litigation followed.

Both receipts contained the following notation: "Charges due warehouseman including processing." Thereafter, *specific* authorized charges for storage and insurance, and receiving in and loading out were listed.

The plaintiff contends that, because no specific amount due for processing was shown on the face of the receipts, it did not have to pay a processing charge to the defendant, but only the charges listed on the receipts. The District Court found that the defendant failed to specify a processing charge upon the warehouse receipts and that the defendant was without lawful authority to impose a processing charge of $8 per cwt. at the time the plaintiff presented the receipts.

The first issue is whether, under the circumstances of this case, the plaintiff was liable to the defendant for a processing charge. It is not disputed by the plaintiff that a public warehouseman is entitled to assess a reasonable charge for processing dry, edible beans.

Section 88-511, R. R. S. 1943, provides that prior to July 1 of each year, the Public Service Commission shall set for the ensuing year reasonable storage rates for public warehousemen, which rates "shall be full compensation for receiving, handling, storing, delivering and insuring." Pursuant to this authorization, the Public Service Commission, in its Schedule E applying to 1973 crops, provided for the following charges for edible dry beans:

(1) storage and insurance   $ .00131 cwt. per day
(2) receiving charge         $ .06 per cwt.
(3) load out charge          $ .06 per cwt.

These charges were listed on the face of the receipts in addition to the notation: "charges due warehouseman including processing."

It is clear from the record that the plaintiff could not reasonably have concluded that the processing charge was included in the Schedule E charges. It is clear that the plaintiff understood the processing charge to be a charge separate from and in addition to the Schedule E charges shown on the receipts.

Wayne Snyder, associated with the defendant for 34 years, testified that it was generally known in this

particular industry that previously the Attorney General had ruled that the Public Service Commission, then the State Railway Commission, had no jurisdiction over processing charges. Larry Birdsall testified that he understood there was a separate charge for processing, distinct from Schedule E charges. Ted Daggett acknowledged that in years prior to 1973, both he and the plaintiff had paid a processing charge separate from other warehousing charges such as storage, insurance, and receiving in and delivering out, and testified as to his understanding that the charge for processing was distinct from charges authorized by the Public Service Commission.

It is also clear from the record that the plaintiff could not reasonably have interpreted the notation: "charges due warehouseman including processing," on the face of the receipts, as an indication that the processing charge had already been paid or was included in the other listed charges. Parol evidence may be used to show the surrounding circumstances of the issuance of a warehouse receipt to throw light on the interpretation of the contract, where the receipt is ambiguous or uncertain. 78 Am. Jur. 2d, Warehouses, § 288, pp. 369, 370. "Words technical or ambiguous on their face, * * * or peculiar * * * to particular trades, professions, occupations, or localities, are explainable where they are employed in written instruments by parol evidence of usage." 25 C. J. S., Customs and Usages, § 25, p. 151.

Larry Birdsall, member of the plaintiff's board of directors, testified that when the beans were delivered to the defendant's warehouse, there was a posted charge of $1.35 per cwt. for processing. He testified that prior to the harvest in 1973, the plaintiff tried to negotiate the processing charge with the defendant, to no avail, and was told that there would be an increase in the processing charge. Birdsall acknowledged that by February 1973, he knew that

the defendant was claiming a processing charge on beans.

In December 1973, the plaintiff ordered some beans out of the defendant's warehouse. Several of the warehouse receipts did not specify the amount of processing charge on their face. The plaintiff, at that time, was assessed a processing charge of $2.70 per cwt. and paid this charge without protest.

Wayne Snyder testified that when the plaintiff's agents came on February 19, 1974, to claim the plaintiff's beans, the following conversation took place:

"Q. Now, what did they say after you informed them that the processing charge was $8.00?

"A. They said it was entirely too high.

"Q. Was that the end of that conversation?

"A. No. We visited a while there and I can't quote verbatim, but I think I said, 'What is a reasonable charge?' And they said, 'Well, $2.70 ought to be a reasonable charge.' "

Birdsall testified that he did not recall whether or not the plaintiff offered to pay a processing charge of $2.70 on February 19, 1974.

Based upon the record it is apparent that a reasonable processing charge was contemplated by the parties. The defendant is thus entitled to a reasonable charge for processing the plaintiff's beans. Under the facts of this case, the plaintiff's contention that it did not have to pay any processing charge to the defendant, because the exact amount of such charge was not specifically indicated upon the face of the receipt, is without merit.

When the plaintiff tried to obtain its beans from the defendant, the defendant demanded a processing charge of $8 per cwt. As previously indicated the defendant was entitled to exact a reasonable processing charge from the plaintiff. The question to be decided next is whether or not a processing charge of $8 per cwt. was reasonable under the circum-

stances. We have reviewed the record and find no evidence in support of this charge as a reasonable one.

The record reveals that 1973 was a difficult harvest year. Erratic weather conditions lowered the quality of the beans harvested. Ordinarily the beans are harvested in September, but in 1973, October was the predominant harvesting month. During the course of the season the price of Great Northern beans started at $15 to $20 per cwt., and advanced rapidly. There was speculation by some growers that the price of beans would reach $100 per cwt.

In December 1973, with the price of beans rapidly advancing, the defendant decided that it would no longer place a stated processing charge on the warehouse receipts, but would simply note that a processing charge was due and then negotiate the price when the beans were processed. Instructions to this effect were given to the defendant's employees. According to Ted Daggett, in past years the processing charge shown on the warehouse receipts was the actual amount charged for processing; and processing charges were paid as indicated on the receipt.

During the 1973 season, the record shows, the defendant's processing charge generally rose. In October 1973, at the beginning of the season, there was a posted processing charge at the defendant's warehouse of $1.35 per cwt. In December 1973, the defendant charged $2.70 per cwt. on $24 per cwt. beans. On February 2, 1974, the charge was $5 per cwt. On February 19, 1974, the plaintiff was charged $8 per cwt. On February 20, 1974, the defendant offered to do processing for $4.50 per cwt. On March 13, 1974, the charge was $7 per cwt.

Processing involves cleaning and bagging beans after they are brought to the warehouse. Wayne Snyder testified that there was a relationship between the cost of processing beans and the value of beans. During the course of processing, some beans

are lost. Also, there is a shrinkage factor as the beans lose moisture during storage. When a warehouse receipt is issued for a certain weight of beans, that same weight of beans must be delivered when the receipt is presented and the beans called for. As the value of beans increases, so does the cost of replacing the beans lost during processing. Larry Birdsall agreed that it would be fair and reasonable for a warehouse to make a processing charge that is tied to the value of the product at the time of processing.

When the beans are first delivered to the warehouse the tare is determined. The grower's truck is driven on the weight scales and the gross weight of the beans determined. A sample of the beans is taken from which the percentage of tare, foreign material such as dirt, rocks, sticks, pods, and small, shriveled, cracked and broken beans, is determined. A percentage of weight is eliminated from the gross weight to represent the tare in the load. A moisture test is also run. A sample of beans is taken and run over a moisture tester which ascertains the percentage of moisture in the beans. An adjustment is then made to account for excess moisture in the beans. During the 1973 season, the defendant deducted down to 15 percent moisture. The beans can also be upgraded from a lower to a higher grade. The charge for upgrading is separate and distinct from the processing charge. Wayne Snyder also testified that the defendant stores its beans in bulk, and is continually processing beans. Snyder also testified that during the 1973 season, the defendant had no new or expensive or different processing equipment.

Other than for Snyder's general assertion that the cost of processing is linked to the price of beans, there is no evidence of any rational basis upon which the defendant's processing charges might be based. Although Snyder stated that the cost of processing was tied to the price of beans, and the plaintiff's wit-

ness Birdsall agreed that a system linking processing to the value of the product when processed would be logical, there is no evidence that the defendant, in fact, employed such a system. There is no indication or evidence of a predetermined schedule of processing charges which escalate as a determinable function of the market price of beans. The record shows that on February 19, 1974, the defendant demanded a processing charge of $8 per cwt. from the plaintiff. The next day the defendant's sales manager, Snyder, called the plaintiff and offered to do the processing for $4.50 per cwt.

As noted earlier, in addition to being a public warehouseman, the defendant, like the plaintiff association, also purchases beans from local growers and markets them. On the date the plaintiff called for its beans, the record shows the grower price for beans was between $32 and $35 per cwt. The market price that day was $42 per cwt. As can readily be seen, were the plaintiff required to pay a processing charge of $8 per cwt. it would be, for all practical purposes, a profitless venture for the plaintiff to market its beans in competition with the defendant. The record shows that when the defendant purchases beans stored with it from its customers, the processing charge is waived by the defendant.

The defendant's sole reason for refusing to deliver the plaintiff's beans on February 19, 1974, was its insistence upon payment of an unreasonable and unjustifiable processing charge. This not being a lawful excuse for nondelivery, the defendant was liable to the plaintiff for conversion of the plaintiff's property as of that date. The measure of damages for conversion is the market value of the converted property on the date of conversion. Baburek v. Skomal, 176 Neb. 832, 127 N. W. 2d 731 (1964). The District Court found the value of the beans in question to be $32 per cwt. as of February 19, 1974. The District Court also allowed, as a set-off from the

amount due the plaintiff, charges made by the defendant for storage, insurance, and receiving in and loading out, totaling $23.89 on each receipt. On a cross-appeal, the plaintiff challenges the District Court's determination of damages.

Larry Birdsall testified that the market value of Great Northern beans on February 19, 1974, was $42 per cwt. Wayne Snyder, the defendant's sales manager, did not dispute this figure. The record shows that $32 per cwt. was the grower price for beans as of that date. The court should not have used the grower price but should instead have used the market price of $42 per cwt. to compute the plaintiff's damages. Were it otherwise, a warehouseman could convert beans, pay the grower price as damages, and obtain a profit by selling at the higher market price.

The District Court also allowed the defendant a set-off against the amount due the plaintiff for charges for storage, insurance, and receiving in and loading out. The plaintiff contends the defendant is not entitled to this set-off, citing section 7-209 (4), of the Uniform Commercial Code, which provides: "A warehouseman loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver."

The District Court properly allowed the set-off. A lien is merely a method by which to enforce an underlying claim. A warehouseman's right to compensation, generally secured by a warehouseman's lien on the property, survives a loss of the lien. See 78 Am. Jur. 2d, Warehouses, § 112, p. 252. While the defendant lost its ability to enforce these charges through the use of the warehouseman's lien, the underlying claim remains valid.

As previously stated, the defendant was entitled to a reasonable charge for processing. The charge it attempted to impose was clearly unreasonable. There is no evidence in the record as to what a rea-

sonable charge would be for processing dry edible beans as of February 19, 1974, and therefore we remand the cause to the District Court to ascertain what was a reasonable charge for processing on that date. Once determined, the defendant will be allowed a set-off for this against the amount due the plaintiff.

The judgment of the District Court is affirmed as modified, and the cause remanded to the District Court for further proceedings in accordance with this opinion.

AFFIRMED AS MODIFIED, AND
REMANDED WITH DIRECTIONS.