CHADRON ENERGY CORPORATION, A NEBRASKA CORPORATION, APPELLANT AND CROSS-APPELLEE, GORDON C. SHAFFER, JR., AND MARIAN SHAFFER, APPELLEES, LESLIE KLEMAN, APPELLEE AND CROSS-APPELLANT, V. FIRST NATIONAL BANK OF OMAHA, A NATIONAL BANK, APPELLEE AND CROSS-APPELLANT.

379 N.W.2d 742

Filed January 17, 1986.   No. 84-553.

W. Scott Davis of Marti, Dalton, Bruckner, O'Gara & Keating, P.C., for appellant.

Alan E. Peterson of Cline, Williams, Wright, Johnson & Oldfather, and Douglas F. Duchek, for appellees Shaffer.

Michael O. Johanns and Lavern R. Holdeman of Peterson Nelson Johanns Morris & Holdeman, for appellee Kleman.

James B. Cavanagh of Erickson & Sederstrom, P.C., for appellee Bank.

KRIVOSHA, C.J., BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

KRIVOSHA, C.J.

The appellant, Chadron Energy Corporation (Chadron Energy), owner of the stock of First National Bank of Chadron (First National-Chadron), a national bank corporation, appeals from an order entered by the district court for Douglas County, Nebraska, finding that Chadron Energy is not entitled to recover damages from the First National Bank of Omaha (First National-Omaha), though First National-Omaha allegedly failed to sell the stock of First National-Chadron in a commercially reasonable manner as required by Neb. U.C.C. § 9-504(3) (Reissue 1980). The basis for the district court's ruling was that because the stock sold for more than Chadron Energy owed to First National-Omaha, no deficiency was created, and, therefore, the issue as to whether the stock was sold in a commercially reasonable manner was moot. First National-Omaha has further cross-appealed, maintaining that the judgment entered by the district court in favor of three former stockholders of First National-Chadron, Gordon C. Shaffer, Jr., Marian Shaffer, and Leslie G. Kleman, was in error. That judgment was based upon a finding by the district court that First National-Omaha had converted stock held by First National-Omaha as bailee for the Shaffers and Kleman. Shaffers and Kleman claimed an interest in the stock as security for a debt owed to them by the group that had purchased Shaffers' and Kleman's bank stock in First National-Chadron.

The record contains evidence concerning a host of transactions both directly and indirectly involved in the issues before this court. We have, however, attempted to isolate those facts which are relevant to the issues presented to us on appeal and will, therefore, not consider certain evidence found in the record but not relevant to the issues presented.

In March of 1979 the First National Bank of Chadron was a national bank corporation with its principal place of business in Chadron, Nebraska. At that time there were issued and

outstanding 2,000 shares of capital stock in First National-Chadron, of which the appellees Gordon C. Shaffer, Jr., and his wife, Marian Shaffer, held 1,185 shares and the appellee Leslie G. Kleman held 630 shares. The remaining shares were held by other stockholders whose interests are not involved in this appeal. On March 6, 1979, six individuals represented by George Wulf (the Wulf Group) entered into a stock purchase agreement with the Shaffers and Kleman. The sale price for the stock was $5 million, part of which was to be paid to the Shaffers and Kleman in cash at the time of the closing and the balance to be represented by notes from the Wulf Group and secured by the stock in First National-Chadron. In order to obtain the necessary cash to make the downpayment, the Wulf Group borrowed $2.1 million from First National-Omaha. Shaffers then received $860,000 in cash and notes totaling $2,102,500, and Kleman received $1,180,000 in cash and notes totaling $395,000. Both the loan from First National-Omaha and the notes given to the Shaffers and Kleman were to be secured by the stock in First National-Chadron. By agreement among all parties, First National-Omaha was designated as the senior lienholder and Shaffers and Kleman as junior lienholders. Individual notes executed by the members of the Wulf Group to First National-Omaha were due in 1 year, at which time First National-Omaha was to be paid in full, thereby causing the lien of the Shaffers and Kleman to become a first security interest in the stock. The stock was physically delivered to First National-Omaha, which assured the Shaffers and Kleman in writing that "[w]e will not release such collateral from our possession until you have notified us that your security interest has been released or discharged." First National-Omaha received six individual stock certificates, each issued in the name of one of the six members of the Wulf Group.

Later in 1979, the individuals in the Wulf Group formed a corporation under the name of First of Chadron Bank Corporation, and on or about January 30, 1980, received the approval of the Federal Reserve Bank of Kansas City to become a one-bank holding company and to acquire the capital stock of First National-Chadron. The holding company's name was

later changed to Chadron Energy Corporation.

Beginning in March of 1980, when the notes of the Wulf Group to First National-Omaha became due, and continuing throughout the summer of 1980, both First National of Omaha and the Shaffers and Kleman granted the Wulf Group various extensions on the loans, which were not being paid regularly. Finally, a public offering of the holding company stock in Chadron Energy was conducted during the summer of 1980. The purpose of this transaction was to acquire sufficient funds from the public offering to allow Chadron Energy to purchase the First National-Chadron bank stock from the Wulf Group. The Wulf Group, in turn, would pay off their debts to First National-Omaha and Shaffers and Kleman and recover the stock being held as collateral. Unfortunately, the public offering did not even produce sufficient funds to pay off the debt to First National-Omaha, and other arrangements had to be made to complete the sale of the stock from the Wulf Group to Chadron Energy.

Even after giving First National-Omaha the proceeds of the public offering, the Wulf Group did not succeed in totally reducing their $2.1 million debt to First National-Omaha. The Wulf Group thus sought to have Chadron Energy assume their loans with First National-Omaha by rewriting them in the amount of $660,000, in the name of the holding company, and then discharging the individual debts of the Wulf Group. First National-Omaha was agreeable to this arrangement but insisted that, before the transaction could be completed, both the Shaffers and Kleman would have to consent to the transference of the stock from the names of the six individuals in the Wulf Group to the holding company. The plan was that once all of this was accomplished, the single stock certificate in the name of the holding company would then be returned to First National-Omaha, which would continue to hold the certificate in its possession as security for its loan and as security for the debt due the Shaffers and Kleman.

Shaffers and Kleman, however, refused to sign the consent forms, and although there was some testimony that an assumption agreement was executed by Chadron Energy to First National-Omaha, no such executed assumption

agreement was ever produced. Instead, it appears that First National-Omaha accepted a new note from Chadron Energy, delivered the six stock certificates to the original owners, and permitted the stock to be reregistered in a single certificate in the name of Chadron Energy. When all of this was completed, a new note, signed by Chadron Energy, and the stock certificate, now in the name of Chadron Energy, were returned to First National-Omaha. The loans to the six individuals held by First National-Omaha were, in effect, marked "paid," and the notes were returned to each of the six individuals.

On October 3, 1982, First National-Omaha notified Chadron Energy that it was in default for nonpayment on its loan, in the total amount of $720,767.10. When they became aware of the impending auction sale of the stock of First National-Chadron, First National-Chadron, its holding company, Chadron Energy, and the Shaffers filed a petition to restrain the sale. They were granted a temporary restraining order but did not post the required bond. First National-Omaha, therefore, conducted the auction of the bank stock on the morning of October 29, 1982, and sold the stock for $1,410,000. First National-Chadron then dismissed itself from the lawsuit, and Chadron Energy and the Shaffers proceeded against First National-Omaha for damages, Shaffers maintaining that the stock in which they had a security interest had been converted by First National-Omaha, and Chadron Energy maintaining that the stock was not sold in a commercially reasonable manner. Several weeks later, Kleman, for the first time, discovered that the stock in which he claimed a security interest had been sold and joined Shaffers in seeking damages for conversion.

Following the trial, the district court found that when First National-Omaha returned the six individual certificates to the individual members of the Wulf Group and permitted the certificates to be canceled and the stock transferred into the name of the holding company, First National-Omaha converted the stock of the Shaffers and Kleman. For that reason, and since it found that the value of the stock in November of 1980 was worth at least the amount of the Shaffers' lien, the district court entered judgment against First

National-Omaha and in favor of Shaffers in the amount of the debt then owing from the Wulf Group to the Shaffers. With regard to the claim made by Kleman, the district court found that notes executed to Kleman by Wulf and one other member of the Wulf Group had been transferred by Kleman to a trust and were now being held by a trustee. For that reason the district court found that Kleman was no longer the real party in interest with regard to these two notes and therefore has no standing to make any claim against First National-Omaha. The district court did, however, find that First National-Omaha did cause the stock securing the remaining four notes to Kleman to be converted, and awarded damages to Kleman in the amount of $201,061.88. For reasons more particularly set out hereinafter, we believe that the decision of the district court must be reversed and the cause remanded for a new trial.

Although all of the parties to this action, and the district court as well, believed that, because an injunction was initially sought, this was an equity action, we believe they are in error. The importance of that decision is that it affects both what our standard of review is and whether we review the action de novo or remand the cause back to the district court for a new trial. Because we believe that this is a law action and not an action in equity, we do not review the matter de novo.

In order to arrive at that conclusion, one must look carefully at the pleadings in this case. Initially, the petition filed by First National-Chadron, Chadron Energy, and the Shaffers sought both a temporary and permanent injunction against the sale of the stock and asked for a declaratory judgment declaring the rights of the parties in the shares of stock of First National-Chadron. After the parties failed to post the bond necessary to obtain the temporary injunction and the sale was completed, Chadron Energy and the Shaffers amended their petition to seek only declaratory relief and abandoned any request for an injunction, temporary or permanent. Neb. Rev. Stat. § 25-21,157 (Reissue 1979) provides that in a declaratory judgment action issues of fact "may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." This court has treated the determination of factual

issues in a declaratory judgment action, which would otherwise be an action at law, in the same manner as if a jury had been waived. The findings of the trial court, therefore, have the effect of a verdict of a jury and will not be set aside unless clearly wrong, see *Larutan Corp. v. Magnolia Homes Manuf. Co.*, 190 Neb. 425, 209 N.W.2d 177 (1973), and, unlike an equity action, are not reviewed de novo. In *Eastern Shore Nat. Gas Co. v. Stauffer Chemical Co.*, 285 A.2d 826, 829 (Del. Ch. 1971), the Delaware court observed: "[T]he test as to whether or not [an equitable question even] exists [is] whether or not, in the absence of a prayer for declaratory judgment, the issues presented should be properly disposed of in an equitable as opposed to a legal action." In the instant case, once the prayer for declaratory relief is disregarded, there is no equitable relief sought. While the plaintiffs, in their respective amended petitions, asked for both a declaratory judgment and "equitable relief," they, in fact, were not entitled to anything but a declaration as to their rights in the stock, and damages, if any. That constituted an action at law. See *First Nat. Bank of Wayne v. Gross Real Estate Co.*, 162 Neb. 343, 75 N.W.2d 704 (1956). This being a law action, we do not review the case de novo on the record but, rather, determine whether the decision is contrary to the law. See *Ranger Division v. Bayne*, 214 Neb. 251, 333 N.W.2d 891 (1983). The fact that there may have been equitable relief sought initially is not binding. A petition in equity may be changed by amendment into an action at law, or vice versa, and it may be amended to seek redress in the form of damages as well as equitable relief. See, *Kraft v. Forest Park Realty & Ins. Co.*, 111 Ga. App. 621, 142 S.E.2d 402 (1965); *Johnston v. Federal Land Bank*, 226 Iowa 496, 284 N.W. 393 (1939). See, also, Neb. Rev. Stat. § 25-856 (Reissue 1979).

We turn, then, to an examination of the issues raised by this appeal. The first issue we address is whether the district court was in error as a matter of law in determining that the claim by Chadron Energy against First National-Omaha was moot. In reaching that conclusion the district court reasoned that the only effect of conducting a sale in a commercially unreasonable manner was to prevent the creditor from obtaining a deficiency judgment against the debtor. See, *State Bank of Litchfield v.*

*Lucas,* 210 Neb. 400, 315 N.W.2d 238 (1982); *First Nat. Bank of Bellevue v. Rose,* 197 Neb. 392, 249 N.W.2d 723 (1977). While it is true that if a creditor conducts the sale of a security interest in a commercially unreasonable manner the creditor may not obtain a deficiency judgment against the debtor, there are also rights afforded the debtor by reason of the creditor's failing to dispose of the property in a commercially reasonable manner. Section 9-504(3) provides in part as follows:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

Neb. U.C.C. § 9-502(2) (Reissue 1980) provides in part: "If the security agreement secures an indebtedness, *the secured party must account to the debtor for any surplus,* and unless otherwise agreed, the debtor is liable for any deficiency." (Emphasis supplied.)

Thus far, then, we find that the statute requires that the creditor must dispose of the property in a commercially reasonable manner and account to the debtor for any surplus which a sale conducted in a commercially reasonable manner might obtain. And, additionally, Neb. U.C.C. § 9-507(1) (Reissue 1980) provides in part:

> If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition *has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part.*

(Emphasis supplied.)

It seems clear to us, therefore, that not only does § 9-504(3) and the requirement that a security interest must be sold in a commercially reasonable manner affect the right of a creditor

to obtain a deficiency judgment but, likewise, the failure to sell a security interest in a commercially reasonable manner affords to a debtor the right to sue for damages for any surplus which the debtor does not realize by reason of the creditor's having failed to dispose of the property in a commercially reasonable manner. Even though the sale may produce a surplus, if in fact a sale in a commercially reasonable manner would have produced a larger surplus, the failure of the debtor to sell the security in a commercially reasonable manner has caused the debtor damages which the debtor has a right to recover in a proper action. The action was not, therefore, moot. However, we need not pass upon the question as to whether the sale by First National-Omaha was in this instance conducted in a commercially reasonable manner because the district court did not pass upon that issue. Instead, we must remand the cause back to the district court for a trial on the question of whether the sale of the stock belonging to Chadron Energy was conducted in a commercially reasonable manner and, if not, what, if any, damages Chadron Energy sustained thereby.

With that we then turn to the question as to whether the district court was correct in its determination that First National-Omaha had converted the stock in which the Shaffers and Kleman had a security interest when, in November of 1980, First National-Omaha permitted the stock in First National-Chadron to be transferred from the six individual members of the Wulf Group to Chadron Energy. The district court concluded that by releasing the stock and permitting the transfer to occur, a conversion was committed. While we believe that First National-Omaha did in fact convert the stock of the Shaffers and Kleman, we do not believe it occurred in November of 1980 but, rather, in October of 1982.

Neb. U.C.C. § 9-306(2) (Reissue 1980) makes it clear that the transfer of the stock in First National-Chadron from the Wulf Group to the holding company did not in any manner diminish or extinguish the security interest held by the Shaffers or Kleman in the stock. Section 9-306(2) provides that "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party . . . ." Here, the evidence is clear

beyond contradiction that neither the Shaffers nor Kleman authorized the disposition of the collateral, and therefore their security interest continued.

Furthermore, Neb. U.C.C. § 9-311 (Reissue 1980) permits such transfer, notwithstanding a provision to the contrary in the security agreement. Section 9-311 provides: "The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default." Courts have consistently held that this section gives a person entitled to sell the unfettered right to transfer his interest in collateral. See *Sturdevant v. First Security Bank*, 186 Mont. 91, 606 P.2d 525 (1980).

The fact that collateral may be transferred voluntarily or involuntarily as provided by § 9-311 does not destroy or adversely affect a prior perfected security interest. See *Brummund v. First Nat. Bank of Clovis*, 99 N.M. 221, 656 P.2d 884 (1983). Rather, the transferee takes subject to the security interest. *Layne v. Fort Carson Nat. Bank*, 655 P.2d 856 (Colo. App. 1982).

The notes executed by the individual members of the Wulf Group to the Shaffers and Kleman were still in effect, and the stock, though now transferred from the Wulf Group to the holding company, was still subject to the lien given by the Wulf Group in favor of the Shaffers and Kleman. Neither this nor the fact that First National-Omaha released the stock temporarily for the purpose of permitting the Wulf Group to transfer the stock to the holding company affects the Shaffers' or Kleman's security interest. Neb. U.C.C. § 9-304(5) (Reissue 1980) specifically contemplates such an action and provides:

> A security interest remains perfected for a period of twenty-one days without filing where a secured party having a perfected security interest in an instrument . . . (b) delivers the instrument to the debtor for the purpose of ultimate sale or exchange or of presentation, collection, renewal or registration of transfer.

Here, there is no evidence that First National-Omaha, the bailee

holding the stock and thereby perfecting the Shaffers' and Kleman's security interests, surrendered the stock for more than 21 days. As such, the perfection continued as to the Shaffers and Kleman.

In view of the fact, then, that the notes from the Wulf Group to the Shaffers and Kleman were not in default in November of 1980, and therefore, as junior lienholders, Shaffers and Kleman were not entitled to immediate possession of the stock from the senior lienholder and that the security interests held by the Shaffers and Kleman in the stock continued after the transfer, the delivery of the stock by First National-Omaha to the Wulf Group for transfer did not constitute an act of conversion.

Furthermore, although First National-Omaha did release the bank stock from its possession, ostensibly in derogation of its written assurance not to do so unless the Shaffers and Kleman gave written consent, this did not amount to a conversion on the part of First National-Omaha. First National-Omaha, by agreeing to hold the collateral for the benefit of the Shaffers and Kleman, the junior lienholders, created a bailor/bailee relationship between itself and Shaffers and Kleman. *Landmark Land Co., Inc. v. Sprague*, 529 F. Supp. 971 (S.D.N.Y. 1981), *rev'd on other grounds* 701 F.2d 1065 (2d Cir. 1983). While it is true that strict adherence to a formal contract for bailment establishes the obligation of the bailee, *Bozell & Jacobs, Inc. v. Blackstone Terminal Garage, Inc.*, 162 Neb. 47, 75 N.W.2d 366 (1956), First National-Omaha's technical breach of the agreement did not amount to a conversion. A bailee may satisfy his obligation by a return of certificates of like kind, there being no obligation to return the identical certificates. See, *Robertson v. Ramsey et al.*, 17 Tenn. App. 248, 66 S.W.2d 1022 (1933); *Christensen v. Pugh et al.*, 84 Utah 440, 36 P.2d 100 (1934). The agreement merely obligated First National-Omaha to hold 1,850 shares of First National-Chadron bank stock, and although there was a gap of time when First National-Omaha did not have possession of the stock, this does not mean that First National-Omaha converted the stock. When First National-Omaha recovered the stock, though it had been reregistered, it remained 1,850 shares of First National-

Chadron bank stock.

For these reasons, then, the finding by the district court was in error. However, as we have indicated, the subsequent sale by First National-Omaha of this stock did constitute a conversion for which Shaffers and Kleman were entitled to seek damages.

When First National-Omaha accepted a new note from Chadron Energy and discharged the notes previously executed by the six members of the Wulf Group, there was a novation. As noted in *First West Side Bank v. Herzog*, 204 Neb. 356, 361, 282 N.W.2d 38, 41 (1979): "In order for a novation to occur, the existing liability must be completely extinguished and a new one substituted in its place. See, Sheridan v. Dudden Implement, Inc., 174 Neb. 578, 119 N.W.2d 64; Thomas v. George, 105 Neb. 44, 178 N.W. 922." While First National-Omaha argues that there was a mere assumption of debt by Chadron Energy, the evidence simply fails to support that claim. The evidence of novation is overwhelming. There was no assumption agreement signed by Chadron Energy. The notes from the six members of the Wulf Group were, in effect, marked "paid" and returned to them. A new note was executed by Chadron Energy and the security previously held by First National-Omaha was released and security of the new debtor, Chadron Energy, obtained. The existing liability from the Wulf Group to First National-Omaha was completely extinguished and a new one substituted in its place.

The significance of all of this is that the superior lien previously held by First National-Omaha was extinguished. "A security interest is defined as 'an interest in . . . property . . . which secures payment of performance of an obligation.' If the underlying obligation ceases to exist, so does the interest securing it." *Poteau State Bank v. Denwalt*, 597 P.2d 756, 761-62 (Okla. 1979). Here, the underlying obligation ceased to exist in November of 1980, and, thus, the original First National-Omaha/Wulf Group security agreement also ceased to exist.

Shaffers and Kleman, their security interests in the stock remaining existent and perfected even after November of 1980, therefore became the senior lienholders as to the stock of First National-Chadron. When First National-Omaha sold the stock

in September of 1982, it converted the stock upon which Shaffers and Kleman had a security interest.

"Where property is subject to a security interest, an exercise of dominion or control over the property which is inconsistent with the rights of the secured party, constitutes, as to him, a conversion of the property; and there may be conversion by [a] secured party where his acts are in defiance of the rights of others in the property."

*Trust Co. v. Associated Grocers Co-op*, 152 Ga. App. 701, 702, 263 S.E.2d 676, 677 (1979). See, also, *Consolidated Equip. Sales v. First Bank, etc.*, 627 P.2d 432 (Okla. 1981); *Amer. Nat. Bk. v. Etter*, 28 Colo. App. 511, 476 P.2d 287 (1970). It seems clear, beyond question, that First National-Omaha, by selling at auction the collateral on which Shaffers and Kleman held a first lien, over the protest of the Shaffers and without notice to Kleman, converted the 1,850 shares of First National-Chadron stock. The act of conversion, however, occurred on October 29, 1982, and not in November of 1980 as found by the district court. This would be true even if the sale was in a commercially reasonable manner. The difficulty, however, is that the court determined the damages to the Shaffers and Kleman as of November 1980, when, in fact, the conversion occurred in October of 1982. The measure of damages for conversion is the market value of the converted property at the time of the conversion. *Associated Bean Growers v. Chester B. Brown Co.*, 198 Neb. 775, 255 N.W.2d 425 (1977). It may very well be that the amounts due and owing were the same on the two dates, though one is inclined to believe that, at the very best, some additional interest may have been due in October of 1982 as compared to November of 1980. Nevertheless, though we find as a matter of law that the evidence established a conversion, we find it to have occurred in October of 1982, and thus, because the wrong date was selected, this portion of the matter must be remanded for trial to determine the amount of damages suffered by the Shaffers and Kleman by reason of First National-Omaha's act of conversion in October 1982. Shaffers and Kleman may recover the value of the property converted at the time and place of the conversion up to the amount due on the liens, including accrued interest. See *Implement Co. v.*

*Dunard*, 181 Mo. App. 658, 164 S.W. 685 (1914).

In view of the fact that the matter must be remanded for trial on the issues set out herein, no other errors need be considered. The judgment is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

BOSLAUGH, J., concurs in the result.