564 F.Supp. 154 (1983)
KISCO COMPANY, INC., Plaintiff,
v.
VERSON ALLSTEEL PRESS CO., Defendant.
No. 82-446C(B).
United States District Court, E.D. Missouri, E.D.
April 26, 1983.
*155 Daniel R. O'Neill, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiff.
William A. Richter, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
REGAN, District Judge.
In its three-count complaint, Kisco Company, Inc. (Kisco) seeks to recover the sum of $240,000, together with interest, the balance allegedly due Kisco for services and information furnished by it to Verson Allsteel Press Company (Verson) at the latter's request.[1] In essence, Kisco asserts the making of an express contract obligating Verson to pay said sum, and alternatively, a quasi-contractual liability on the latter's part based on its alleged unjust enrichment by obtaining and using the services and information.
This litigation had its genesis in Verson's desire to obtain information which would be helpful in preparing a bid to Mason-Chamberlain Company, a government contractor, in response to Request for Proposal (RFP)-0054 for an integrated system to manufacture M42/46 grenade bodies. Verson had had many years of experience in the design and manufacture of metal forming presses generally, but no recent experience in designing presses for the type of system called for in RFP-0054. In addition, it had no operating cost data nor much of the other factual information it was required to furnish in conjunction with a bid. The period of time within which to obtain this information was extremely short.
In this situation, Verson sought the assistance of existing producers of M42/46 grenade bodies whose cost data and other relevant information would be helpful and whose tooling system could be copied in the event Verson was unwilling or unable to design its own system in the time available.
After failing to "team" with two other manufacturers of grenade bodies, Verson contacted Kisco which has produced grenade bodies since 1976. A plant tour of Kisco's facilities was arranged for October 6, 1980. At that time, a group of Verson employees headed by Ken Otsuka visited the Kisco plant and obtained a great deal of information (without charge) respecting Kisco's facilities and procedures from Robert H. Hoffman, its vice-president of engineering. It was not unusual for Kisco to permit other companies to tour its plant in this manner.
Several days thereafter, when apprised by Hoffman of Verson's desire for assistance, Jerome T. Holden, Chairman of the Kisco Board, requested its attorneys to prepare a draft of a memorandum of agreement on the basis authorized by him, and such a draft was prepared as of October 9, 1980, reciting, inter alia, that Kisco and Verson "have agreed" to the provisions *156 therein. As of that time, however, there had not been any discussion with Verson about the terms of a possible agreement.
On October 10, 1980, Otsuka again visited Kisco and with Donald Smith, Verson's Vice-President of Marketing, was given another informative tour of the plant. In the course of this visit, there was little more than general conversation concerning the ability and willingness of Kisco to provide assistance to Verson, but no specific figures as to the price of such assistance were discussed.
In the next several days, Otsuka and Holden were in telephone communication and came to an understanding that whatever assistance Kisco was to provide would be in two phases. The first or pre-bid phase related to furnishing general conceptual (non-proprietary) information, visual and oral, pertaining to Kisco's presses and which could be utilized by Verson in the preparation of its bid. The second or manufacturing phase related to furnishing all drawings, specifications, product and maintenance records and other specialized proprietary information to enable Verson to copy Kisco's tooling in the event Verson was the successful bidder. It was agreed that the cost to Verson for the total package of assistance would be $250,000, provided Verson was awarded the Mason-Chamberlain contract, but that if it was the unsuccessful bidder, it would, in any event, pay Kisco $10,000 plus a fee of $50 an hour for the time of Kisco personnel.
After arriving at the foregoing understanding, Holden and Otsuka agreed that a written contract covering all the terms deemed necessary would be prepared by Holden and submitted to Verson for approval. It was further agreed that because of the time restraints creating an urgency as to phase one, Verson's personnel could continue their visits to the Kisco plant and obtain further background information while the parties were engaged in hammering out a definitive written agreement. Such a visit took place on October 15. It is obvious that as of that time and for several weeks thereafter neither party doubted that a written agreement would be arrived at and executed on mutually satisfactory terms.
On October 15, Holden transmitted to Verson his draft of an agreement. As Kisco should have anticipated in light of its own experience, Verson questioned the adequacy (more accurately, the omission) of any protective provision in the phase two portion of Kisco's draft. After a number of inter-company discussions relating to the Kisco draft (as well as prodding from Kisco, which was becoming restive by reason of the absence of an agreement), Verson signed and sent Kisco under date of October 27 its revised version of an agreement. Had Kisco accepted and signed the October 27 Verson "agreement", the present controversy could well have been obviated.
The Verson draft added a Paragraph 7 containing two warranties, one, that Kisco owned and had the right to furnish to Verson the know-how and technical information it was to provide, and two, that "to Kisco's knowledge" such know-how and technical information did not infringe any United States patents. The latter provision was of importance to Verson in view of the stipulation in RFP-0054 that the successful bidder indemnify Mason-Chamberlain (and ultimately the United States government) against liability for patent infringement.
As important, if not more so, in light of Verson's intention to copy Kisco's system, was Verson's requested warranty as to Kisco's right to furnish (i.e., sell) to Verson its proprietary technical information and know-how (which would, of course, include the detailed drawings and blue prints of its machinery and tooling). This equipment, which had been manufactured by Waterbury Farrell (a competitor of Verson) on order from Kisco, had been developed jointly by them, utilizing both Kisco's and Waterbury Farrell's proprietary information.
A disagreement as to their respective rights in the process was resolved by an ambiguous document, wherein it was agreed that the items Kisco had purchased from Waterbury Farrell are the "property" *157 of Kisco which it could "use" as it saw fit and that Waterbury Farrell has the right to sell Waterbury Farrell equipment which utilized a combination of Waterbury Farrell and Kisco proprietary fabrication information. However, the language employed did not clearly, if at all, cover Kisco's right to sell the proprietary information owned and utilized by Waterbury Farrell in the manufacture of the process.
Upon receipt of the Verson draft, Kisco consulted its patent attorney who drafted a revised Paragraph 7. Kisco also added a new Paragraph 8.
In its revised version of Paragraph 7, Kisco drastically narrowed the proposed warranty of non-infringement to provide in lieu thereof that in Kisco's "opinion" the tooling and know-how does not infringe Waterbury Farrell's Patent 4,147,049, adding that Kisco "makes no warranty as to whether the tooling and know-how infringe any patent", thus creating the impression that it has knowledge of other patent infringement.
Kisco's revision of Verson's proposed simple and unambiguous warranty of ownership and right to sell is equally suspect. We can conceive of no good faith reason for the proposed new language absent an intent to evade compliance with Verson's request. That Kisco was concerned about its rights is manifested by Holden's October 22, 1982 memorandum to himself to "Determine Kisco's right to sell know-how", as well as by the language employed in its revised version.
What Verson had proposed was that "(a)s a material consideration for this agreement, Kisco warrants to Verson that it owns and has the right to furnish the know-how and technical information to be provided under this agreement." Not only did Kisco eliminate the "material consideration" aspect, but the substituted language merely tracked a portion of its agreement with Waterbury Farrell, namely, that the tooling, tooling drawings, presses and other items (collectively, tooling and know-how) "are the property of Kisco and that Kisco is free to make use of the tooling and know-how as Kisco sees fit." This revised warranty begged the question as to whether the authority to "use" the tooling and know-how included the right to market the know-how and tooling.
Kisco's newly revised draft was mailed to Verson at about 5 p.m. on Friday, October 31. No mail is picked up by Verson on Saturday, so that the new draft addressed to Johnson was actually received at Verson on November 3, probably after 10 a.m. Unaware that Kisco had revised the Verson version, Otsuka had traveled to St. Louis where he visited the Kisco plant at about 9 a.m. on November 3, 1980, at which time no doubt he obtained more background information. No further assistance from Kisco was requested or sought by Verson after November 3.
About this time, Verson concluded that the Kisco tooling could not be utilized by it if its contemplated bid was successful, and on November 14, Kisco was informed that no agreement would be entered into. A week later, Verson submitted its bid to Mason-Chamberlain, based on a system independently designed by Verson and which in our judgment did not incorporate any portion of the Kisco system.
The initial question is whether the various "understandings" and "agreements" as to the amount of compensation and the general nature of assistance to be provided by Kisco constituted a binding oral contract as of October 14, 1980, even though the parties were subsequently unable to reach an agreement as to the specifics of the terms to be incorporated into a written agreement.
The parties are in accord that Missouri law applies. There can be no question but that under the Missouri authorities, where the parties have reached an oral understanding as to all of the essential terms of a proposed contract, the mere fact that the parties have also agreed to reduce the contract to writing does not negative the existence of a present contract. See Priest v. Oehler, 328 Mo. 590, 41 S.W.2d 783 (1931) and Collins v. Swope, 605 S.W.2d 538 *158 (Mo.App.1980). Whether the oral negotiations have in fact culminated into a present binding contract depends upon the intentions of the parties. And as noted in Collins, at 540, intention is a state of mind usually determinable by the trier of the fact through logical deduction from proven facts.
Kisco stresses the use of the phrase "have agreed" contained in each of the three proposed Memoranda of Agreement as proof of the existence of a prior binding contract. We do not agree. In our judgment, these words do not imply that the parties had theretofore agreed to the terms set forth therein, any more than did the use of the identical words in the Memorandum of Agreement prepared by Kisco's attorney prior to the commencement of negotiations. Not until a particular Memorandum of Agreement was signed by both parties could the words "have agreed" be meaningful. And the very fact that each of the Memoranda contains essential provisions which the other party refused to accept demonstrates that the parties had not agreed thereto.
Our examination of the facts in evidence and weighing the credibility of the witnesses has left us with the firm conviction that as of October 14, 1980 and until Verson terminated the negotiations, neither party intended to bind Verson to pay $250,000 absent a signed agreement in writing spelling out all the precise terms to which the parties were to be bound followed by a purchase order. That the parties did not then contemplate they would have any problem in drafting the writing does not alter our conclusion.
From the very inception of the discussions between the parties, Kisco clearly manifested its intention that a written agreement was a condition precedent to the existence of a binding contract. In addition to the fact that as early as October 9, 1980, before any negotiations had even begun, Kisco had its attorneys prepare (unilaterally) a draft of an agreement, on October 14, 1980, when Kisco expressed its willingness to assist Verson, Holden wrote in his day-book "Write agreement." Thereafter, on October 22, 1980, Holden again wrote "Need letter of intent." Unquestionably, Holden was concerned (and he so testified) that Verson had not by then signed and returned the draft prepared by him (together with a "purchase order"), a concern which is inconsistent with a belief that the purpose of a written agreement was simply "to memorialize the oral agreement made by the parties on October 14, 1980."
The present case is wholly unlike that of Priest v. Oehler, supra, in which every term of the contract had been orally assented to. And Collins v. Swope, supra, involved only the sufficiency of the petition to state a claim as against a motion to dismiss. Here, it is clear that some of the terms had not been agreed to. What was agreed to orally was the amount of the compensation and the general nature of the assistance to be provided and the timing thereof. However, not all of the specifics of Kisco's obligations, including precisely the what, when and how of the items to be furnished, as well as Kisco's warranty of its right to sell its know-how and a warranty of non-infringement had been agreed to. Although neither warranty may have been of essential relevance on phase one, they directly affected Verson's right to copy Kisco's process as it contemplated on phase two to Kisco's knowledge.
It was Kisco's reluctance to assent to an agreement which contained the requested warranties which ultimately led to the termination of Verson's relationship with it. We are aware that Verson did not place its decision to terminate the deal on that ground, but this fact is legally immaterial. Inasmuch as the parties had not entered into a binding contract (for whatever the reason), Verson could (as it did) decide on the basis of what it then knew (after Kisco submitted its counter offer as of October 29, 1980, thus rejecting the Verson offer of October 27, 1980) it was economically inadvisable for it to further negotiate with respect to phase two. As noted supra, had Kisco signed the October 27, 1980 Verson draft of an agreement so that a contract *159 would have resulted, the situation would have been entirely different.
That Verson obtained a great deal of useful and valuable information from Kisco is admitted. So, too, is its liability to Kisco for $10,000 (the phase one price) as well as for the fees agreed to be paid to Kisco's personnel for the time they spent at Verson's instance. These amounts were paid before the suit was filed. The litigated issue was Verson's liability, vel non, for the additional $240,000 claimed by Kisco.
It is Kisco's theory (based on its premise that a binding oral contract had been entered into covering both phases as a whole) that by reason of its willingness to furnish to Verson the proprietary information and documents outlined in the phase two portion of the written drafts of agreement[2] in spite of Verson's refusal to accept the same, Verson became liable for the entire phase two sum of $240,000. Having ruled adversely to Kisco on its express contract claim, it follows that Verson is not liable thereon. This disposition of Kisco's contract claim moots that issue, not briefed by the parties or considered by us, of whether the refusal of a purchaser to accept items such as here involved, necessarily and without more entitles the seller to recover the full agreed purchase price of such items.
We turn next to the question of whether Verson's actions in seeking and obtaining the phase one assistance, albeit in good faith, creates liability on its part on the theory of quantum merit or quasi-contract for any sum in excess of the $10,000 it has already paid. In our judgment, the information provided to and utilized by Verson had a value greatly in excess of $10,000, but substantially less than $250,000, and that Verson is liable for the additional value.
Otsuka testified, and we find, that $250,000 was a reasonable price for the entire package of assistance which Verson contemplated it would require and use. But such finding is premised on the assumption that with the aid of the detailed drawings and blue prints and other proprietary information, Verson would copy and be able to use Kisco's system "lock, stock, and barrel", and thus avoid incurring the very substantial cost of designing its own system in the short period of available time.
However, before it was furnished any proprietary information, Verson realized that it stood little chance of obtaining the Mason-Chamberlain contract if it were to copy the Kisco system without costly modifications, and that much the better course would be to design its own system. Kisco's rejection of the Verson proposal of October 27 enabled Verson to follow through on this realization.
Kisco argues that Verson having "agreed" upon the price of $250,000 for the package of assistance it was to provide, that amount is prima facie evidence of the reasonable value of the information it actually provided. This contention not only erroneously assumes the existence of a binding agreement upon the basis of which that sum was to be paid, but overlooks the fact that absent the requested warranties, the package would have a value substantially lower than $250,000 even if the phase two information had been furnished.
It is Verson's position that inasmuch as the parties had "agreed" upon the sum of $10,000 to be paid for the phase one assistance, that amount (in the absence of any other direct evidence of value) constitutes prima facie evidence of the value to be assigned to the information furnished to it. Verson's contention erroneously assumes that the proposed contract was intended to be severable as to each phase.
We are convinced that in agreeing upon the sum of $10,000 to be paid for pre-bid assistance in the event Verson was not the successful bidder, neither party intended to fix that amount as the reasonable value of the services and information Kisco was to provide under phase one of the package. *160 As we view the evidence, Kisco arbitrarily fixed that amount (premised upon the failure of Verson to obtain the contract), without consideration of the actual value of the phase one assistance, simply to enable it to recoup at least a portion of what such services would be worth if Verson obtained the contract.
As noted supra, Verson obtained useful and valuable information without which it could not have prepared its successful bid. In addition, although the phase one assistance was of aid in the preparation of the Verson bid, it related to much more than that. Verson was enabled to determine not only what it should do and how it should do it, but also what it should not do, a determination it could not have made but for the information it obtained from Kisco.
This case is a classic example of quasi-contract arising from unjust enrichment, that is, the receipt by one person from another of a valuable benefit the retention of which without adequate compensation is unjust. Our problem in determining fair compensation is compounded by the respective positions taken by the parties at the trial, with Kisco insisting that it is entitled to the maximum of $250,000 with no discount, and Verson claiming that under the evidence its liability is limited to the amount it paid, the sum of $10,000.
Although we seriously question whether by reason of the nature of the information and services provided by Kisco, and the unusual factual situation, expert testimony would be of much aid to the Court, neither party presented such evidence. Hence, as trier of the fact, we are confronted with the difficult task of determining from all the facts and circumstances in evidence what amount of money will constitute fair and just compensation to Kisco. Obviously, in situations such as here present, mathematical exactness cannot be achieved.
Starting from the premise that $250,000 would have been reasonable had all the contemplated information been provided and utilized, and the fact that it was not nor could have been copied, and that Verson's cost was thereby increased by some $140,000[3] we have concluded that the reasonable value of the services and information actually furnished to and utilized by Verson is the sum of ONE HUNDRED TEN THOUSAND DOLLARS of which Ten Thousand Dollars has been paid.
The foregoing memorandum opinion constitutes our findings of fact and conclusions of law. Judgment will be entered in favor of plaintiff in the sum of ONE HUNDRED THOUSAND DOLLARS together with interest from March 26, 1982 and costs.
NOTES
[1] Substantial punitive damages were also prayed, but the claims therefor have in effect been abandoned. We find no evidentiary or other basis for such an award.
[2] We note that Kisco's offer of performance did not include any warranty of right to sell the know-how or non-infringement of patent.
[3] It is not without significance that Otsuka sought a downward, but unspecified revision or adjustment of the $250,000 figure after he realized that the Kisco process could not be used, but at a time he was not aware that Verson's October 27, 1980 proposed contract had been rejected. Holden refused to lower the figure, not realizing that by having submitted a counter proposed agreement, the legal effect was to prevent a binding contract from coming into existence.