**FREMONT NATIONAL BANK AND TRUST COMPANY, Appellee,**

v.

**COLLATERAL CONTROL CORPORATION, Appellant.**

**FREMONT NATIONAL BANK AND TRUST COMPANY, Appellant,**

v.

**COLLATERAL CONTROL CORPORATION, Appellee.**

Nos. 83–1302, 83–1339.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1983.

Decided Dec. 28, 1983.

Rehearing Denied Feb. 1, 1984.

Robert L. Berry, Kennedy, Holland, De-Lacy & Svoboda, Omaha, Neb., for appellant Collateral Control Corp.

Lawrence H. Yost, Yost, Schafersman, Yost, Lamme & Hillis, Fremont, Neb., for appellee Fremont Nat. Bank and Trust Co.

Before BRIGHT, JOHN R. GIBSON and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

Fremont National Bank and Trust Company (the Bank) brought this diversity action against Collateral Control Corporation for an alleged misdelivery of 811 cattle held by Collateral Control for the Bank pursuant to a field warehousing arrangement. The district court[1] determined that Collateral Control misdelivered 663 cattle and awarded damages to the Bank in the amount of $255,201.60, together with 12% interest from the day after the last misdelivery to the date of judgment. Both parties appeal. We affirm.

On appeal, Collateral Control argues that the district court erred in finding that its actions constitute a misdelivery, rather than simply a breach of contract. Collateral Control also contends that the award of prejudgment interest was inappropriate. The Bank, in its cross-appeal, argues that the court erred in concluding that 148 cattle "were sufficiently demonstrated to be warehoused cattle" and thus disallowing recovery of their value.

I. *Background.*

Vance K. Willard, doing business as a proprietorship named Fremont Cattle Company, operated as a livestock order buyer. For a commission, he would locate cattle desired by a potential buyer, purchase the cattle, and deliver them to the buyer. In most cases, after Willard purchased the cattle, he brought them to his farm, where they were sorted, dipped, vaccinated, and worked before they were shipped to the buyer.

Starting in 1973, the Bank financed a small percentage of Willard's cattle purchases. To secure these loans, the Bank held a perfected security interest in Willard's equipment, farm products, and all his livestock. In June of 1975, Collateral Control established a warehouse on Willard's property to secure and control the financed cattle for the benefit of the Bank.

To obtain financing, Willard notified Collateral Control's bonded agent, who resided on the warehouse premises, that certain incoming cattle were to be stored in the warehouse. The agent filled out a receiving record, noting the approximate weight of the cattle received, the sex, the number of head unloaded, the number of the lot where the cattle were to be held, the date of receipt, and the declared value of the cattle. Willard delivered this report to the Bank's agricultural loan officer, who, after reviewing the record, calculated the market value of the cattle and then loaned Willard 80% of that amount. Collateral Control then issued and mailed to the Bank a nonnegotiable warehouse receipt representing the financed cattle.

A letter of instructions from the Bank dated January 21, 1980 governed the release of receipted cattle from the field warehouse. The letter authorized Collateral Control to deliver cattle from the warehouse, provided that it forward to the Bank upon each delivery a warehouse release and a check in payment of the delivered cattle.[2]

---

1. The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska.

2. The letter read in part,
   Until you receive from us a written revocation or amendment of the following instruc-

The warehousing arrangement apparently functioned satisfactorily until the end of March 1980. From March 30, 1980 to April 1, 1980, Willard requested that Collateral Control's agent release a total of 663 head of warehoused cattle. Upon each request, the agent prepared a warehouse release—noting the quantity, kind, and value of the property delivered—and a check for the declared value. Willard signed the documents. The agent gave the documents to Willard at his request and, therefore, did not forward the documents to the Bank before the close of the day.

On April 3, 1980, Willard and his wife filed a petition for relief in the United States Bankruptcy Court for the District of Nebraska. At that time, the Bank held warehouse receipts issued by Collateral Control's agent covering 811 cattle. Only 167 cattle remained on Willard's property.

## II. *Discussion.*

### A. *Misdelivery.*

■ Under the field warehousing arrangement, Collateral Control was a bailee of the cattle covered by the warehouse receipts issued to the Bank.[3] As such, Collateral Control became obligated to deliver these cattle to "the person to whom delivery is to be made by the terms of or pursuant to written instructions under a nonnegotiable document."[4] The district court found that the Bank's letter of January 21, 1980, governed the delivery of warehoused cattle. This letter authorized Collateral Control to deliver warehoused cattle to Willard, provided that it forward to the Bank a warehouse release and a check from Willard for 100% of the declared value of the delivered cattle before the close of business on the day of delivery.

From March 30, 1980 to April 1, 1980, Collateral Control delivered 663 head of warehoused cattle to Willard, without retaining and forwarding the required documents to the Bank. The Bank contends that Collateral Control misdelivered the cattle and thereby became absolutely liable to the Bank for the value of those cattle. Collateral Control, on the other hand, argues that the deliveries were proper, and that its failure to mail the required documents to the Bank constituted a mere breach of contract, for which its liability is limited to those losses which were the prox-

tions, this letter will constitute your authority to deliver from your warehouse # 2492 to Vance Willard d/b/a Fremont Cattle Company upon its request, property stored therein and covered by your non-negotiable Warehouse Receipt, now or hereafter issued to the undersigned provided:

     *   *   *   *   *   *

(2) That not later than the close of business that day during which any property is delivered, you will forward to us your regular form of Warehouse Release in duplicate listing the quantity and kind and value of the property delivered. That you attached to the above Warehouse Release a check that will be tendered to your Bonded Agent by Vance Willard payable in our favor in an amount equal to 100 percent of the declared value of the property delivered under this authorization. We will sign and forward the original Warehouse Release to your office, retaining the duplicate for our file.

     *   *   *   *   *   *

(4) That in the event you are unable to comply with the instructions set forth above you are to make no further delivery and communicate with this office for further instructions.

**3.** Neb.Rev.Stat. ch. 91, § 7–102(1)(a) (Reissue 1980) provides,

    (a) "Bailee" means the person who by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them.

**4.** Neb.Rev.Stat. ch. 91, § 7–403(1) and (4) (Reissue 1980)

    (1) The bailee must deliver the goods to a person entitled under the document, unless and to the extent that the bailee establishes any of the following:

    * * * [Excuses for non-delivery].

    (4) "Person entitled under the document" means holder in the case of a negotiable document, or the person to whom delivery is to be made by the terms of or pursuant to written instructions under a nonnegotiable document.

imate result of the breach.[5] In support of its contention, Collateral Control cites *Utica National Bank & Trust Co. v. Happy Wheat Growers, Inc.,* 558 F.2d 279 (5th Cir.1977).

In *Utica,* as in this case, the warehouseman delivered warehoused cattle to a third party without following the governing letter of instructions from the bank, the secured party that held the nonnegotiable warehouse receipts covering the cattle. The instructions authorizing delivery required the warehouseman to forward a confirmation of delivery to the bank no later than the next business day after delivery. On five occasions, the warehouseman was late in mailing these confirmations of delivery. The Fifth Circuit held that the warehouseman did not misdeliver the cattle, but simply breached its contract with the bank, reasoning that there was "no logical nexus between forwarding a confirmation by mail on the next business day after a delivery and the validity of the delivery which has already taken place." *Id.* at 282–83. The warehouseman's liability was limited to the losses attributable to the breach of contract, not the market value of the cattle covered by the confirmations that were delivered late.

The facts in the case before us are distinguishable from those in *Utica.* Unlike the warehouseman in *Utica,* Collateral Control was not merely late in mailing the required documents to the Bank. Nor did it simply fail to mail them altogether. Collateral Control did not even keep the documents; instead, it returned them to Willard at his request. Moreover, Collateral Control not only returned the warehouse releases to Willard (these documents, like the confirmations of delivery in *Utica,* notified the Bank as to the quantity, kind, and value of the property delivered), but also surrendered Willard's checks which had been received by the warehouseman in payment for the cattle.

The letter of instructions required Collateral Control to attach Willard's check to its own warehouse release, and forward both documents to the Bank on the day of delivery. This arrangement assured the Bank that payment, albeit by check, would accompany any delivery. A timely mailing would enable the Bank, upon receipt, to process Willard's check for payment promptly. If the check were dishonored, the Bank could then take appropriate action against Willard. The fact that the check might later be dishonored does not change the scope of Collateral Control's authority to deliver the cattle. The instructions make it clear that Collateral Control was authorized to deliver cattle to Willard only upon receipt of Willard's check for 100% of the value of the cattle.[6] Even though, in this case, Collateral Control's agent initially obtained Willard's check, voluntarily returning the check to Willard essentially cancelled Collateral Control's authority to deliver the cattle.

The facts in this case are analogous to those in *Turner v. Scobey Moving and Storage Company,* 515 S.W.2d 253 (Tex.1974). There, the warehouseman released warehoused goods without requiring production of the nonnegotiable warehouse receipt that it had issued upon deposit of those goods, contrary to the written instructions on the receipt. *Id.* at 254. In an action brought by the holder of the warehouse receipt, the court held that the warehouseman misdelivered the goods and therefore was liable for their value. *Id.* at 256.

---

**5.** Collateral Control argues that its failure to mail Willard's checks was not a proximate cause of the Bank's loss. Collateral Control contends that, had it mailed the checks, they would have been returned for insufficient funds anyway. Because we find that Collateral Control's actions constitute a misdelivery for which it is absolutely liable, this argument is inapposite.

**6.** Although the instructions do not explicitly require Collateral Control to release the cattle only upon receipt of Willard's check, such a requirement is necessarily implied. Collateral Control can hardly forward Willard's check to the Bank if it fails to get the check from Willard.

The governing instructions in *Turner* authorized delivery to that person who produced the warehouse receipt. Similarly, the instructions in this case authorized delivery to Willard upon receipt of his check. In both cases, the contractual provision that the warehouseman ignored was essential to protect the rights of the warehouse receipt holder; noncompliance rendered the entire warehousing arrangement meaningless. This is not to say that the contractual provision at issue in *Utica* was not important to the warehousing arrangement. The confirmation of delivery, which the warehouseman in that case was required to mail to the bank, kept the bank abreast of the flow of collateral out of the warehouse. It was not a provision, however, like those in this case and *Turner,* that restricted to whom and when the warehouseman could make a delivery. The warehouseman's failure to follow instructions, in both this case and *Turner,* resulted in deliveries to persons not entitled to receive the goods.

We conclude that the district court did not err in concluding that when Collateral Control delivered cattle to Willard without retaining and mailing the required documents to the Bank, it misdelivered the cattle. Accordingly, the district court was correct in awarding the Bank the value of the misdelivered cattle.

### B. *Identified Cattle.*

■ The district court found that 148 cattle of the 167 on hand at the time Willard instituted bankruptcy proceedings, "were sufficiently demonstrated to be warehoused cattle covered by those warehouse receipts numbered 19301 (119 heifers) and 19303 (29 heifers)." The Federal Rules of Civil Procedure require us to accept this finding unless it is clearly erroneous. *See* Fed.R.Civ.P. 52(a). A finding of fact is clearly erroneous if, upon reviewing the entire record, we are left with the definite and firm conviction that a mistake has been made. *Peterson v. United States,* 673 F.2d 237, 239 (8th Cir.1982). A finding is not clearly erroneous merely because we might have reached a different result had the case been tried originally before us. *Nye v. Blyth Eastman Dillon & Co., Inc.,* 588 F.2d 1189, 1196 (8th Cir.1978).

■ Of the 167 cattle on Willard's farm, 161 were heifers, ranging from an average weight of 445 pounds to an average weight of 895 pounds.[7] The 148 cattle for which the Bank held receipts were all heifers, 119 with an "approximate weight" of 578 pounds[8] and 29 with an "approximate weight" of 900 pounds. Although the evidence is not definitive, the "approximate weights" of the heifers for which the Bank held receipts and the average weights of the heifers that remained on Willard's farm after he filed for bankruptcy were not so disparate as to leave us with "the definite and firm conviction" that the district court made a mistake when it determined that 148 cattle "were sufficiently demonstrated to be warehoused cattle."

The Bank relies on two points to support its contention that the district court's find-

---

**7.** At the final pretrial conference, the parties stipulated that the 167 cattle, which were sold on May 16, 1980, included:

6 steers;

7 heifers at a combined weight of 6,270 lbs. [average weight of 895 lbs.];

27 heifers at a combined weight of 14,195 lbs. [average weight of 525 lbs.];

36 heifers at a combined weight of 19,575 lbs. [average weight of 545 lbs.];

24 heifers at a combined weight of 14,515 lbs. [average weight of 605 lbs.];

12 heifers at a combined weight of 5,320 lbs. [average weight of 445 lbs.];

17 heifers at a combined weight of 9,465 lbs. [average weight of 555 lbs.];

22 heifers at a combined weight of 14,810 lbs. [average weight of 675 lbs.]; and

16 heifers at a combined weight of 12,230 lbs. [average weight of 765 lbs.]

**8.** The receipt for these 119 cattle (19301) originally covered 219 cattle with an "approximate weight" of 578, but 100 of them were released prior to April 3, 1980.

ing is clearly erroneous. First, the 167 head of cattle were in six different pens, none of which corresponded to the pens identified on receipts 19301 and 19303. The record indicates, however, that the warehoused cattle were consistently commingled with the rest of the cattle and were rarely, if ever, kept in the pens designated on the appropriate warehouse receipts. Second, the Bank points out that it financed only a small percentage of Willard's cattle sales and, therefore, only a small number of the cattle on Willard's farm at any one time were warehoused cattle. Although this fact may support an inference that the 148 heifers were not warehoused cattle, it does not establish that a contrary finding is clearly erroneous.

On April 3, 1980, the Bank held warehouse receipts numbered 19301, 19302, 19303, 19817, 19821, and 19825. These receipts represented a total of 811 cattle, presumably stored in Collateral Control's field warehouse. Collateral Control admitted that, by April 3, 1980, it had released 663 of the cattle for which the Bank held receipts: 100 of the 219 heifers covered by 19301 and all of the 563 cattle covered by 19302, 19812, 19821, and 19825. Nothing in the record indicates that Collateral Control released the remaining 148 cows for which the Bank held receipts—the additional 119 heifers covered by 19301 and the 29 heifers covered by 19303—either before or after April 3, 1980. Accordingly, we conclude that the district court's determination that the 167 cattle, sold with the approval of the bankruptcy court on May 16, 1980, included 148 warehoused cattle is not clearly erroneous.

C. *Prejudgment Interest.*

The law of the state where the cause of action arises governs whether a party in a federal diversity action is entitled to prejudgment interest. *Bauer v. Uniroyal Tire Co.,* 630 F.2d 1287, 1290 (8th Cir.1980). Nebraska law requires prejudgment interest when the amount of the claim is liquidated. *Philip G. Johnson & Co. v. Salmon,* 211 Neb. 123, 131, 317 N.W.2d 900, 905

(1982) (citing Neb.Rev.Stat. § 45–104 (Reissue 1978)). A claim is liquidated if it is fixed and determined or if it is readily determinable by computation or by reference to a recognized standard. *Schmidt v. Knox,* 191 Neb. 302, 306–07, 215 N.W.2d 77, 79 (1974) (prejudgment interest on the value of warehoused beans was allowed where the weight of the beans was known and their market value was stipulated). The district court concluded that the Bank's claim was liquidated. We agree.

Generally, a warehouseman's unauthorized delivery of bailed goods constitutes a conversion. Restatement (Second) of Torts § 234 (1964); 93 C.J.S. *Warehousemen and Safe Depositaries* § 194a (1956). If liability is established, the measure of damages for conversion is the value of the converted property on the date of conversion. *Associated Bean Growers v. Chester B. Brown Co.,* 255 N.W.2d 425, 431 (1977). The value of the misdelivered cattle, in this case, was readily determinable by reference to Collateral Control's own records. Accordingly, the district court did not err in awarding prejudgment interest.