KISCO COMPANY, INC.,
Appellant/Cross-Appellee,

v.

VERSON ALLSTEEL PRESS COMPANY, Appellee/Cross-Appellant.

Nos. 83–1704, 83–1755.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1984.

Decided June 29, 1984.

Rehearing Denied June 30, 1984.

Thomas C. Walsh, Daniel R. O'Neill, Mark S. Deiermann, St. Louis, Mo., for appellant/cross-appellee Kisco Co., Inc.; Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

William A. Richter, Stephen H. Rovak, St. Louis, Mo., Sheldon L. Solow, Chicago, Ill., for appellee/cross-appellant; Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., Schwartz & Freeman, Chicago, Ill., of counsel.

Before ROSS, JOHN R. GIBSON and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Kisco Company, Inc., obtained a judgment of $110,000 against Verson Allsteel Press Company for furnishing services and information that assisted Verson in preparing a bid for the manufacture of grenade bodies. The district court [1] found that neither party intended to bind Verson to pay $250,000 for such services and information absent a signed agreement, but that under principles of quasi-contract Kisco was entitled to recover $110,000. On appeal Kisco essentially argues that an oral contract for $250,000 existed between the parties, that it had fully performed, and that Verson was simply attempting to renegotiate. Verson also appeals, arguing that Kisco was not entitled to any more than the $10,-000 negotiated for the first phase of services, that the district court erred in awarding Kisco an additional $100,000 on a quasi-contractual basis, and that Kisco should not have been awarded prejudgment interest. We affirm the judgment of the district court on the contract and quasi-contract issues, but remand the case for further consideration of the prejudgment interest issue.

Verson is engaged in designing and manufacturing metal-forming machines and systems. In the fall of 1980 Mason-Chamberlain, Inc., a government contractor, sought bids for the production of machinery and tooling necessary to produce M-42/M-46 grenade bodies. Verson wished to submit a bid, but because of its inexperience in the field attempted to team up with a number of companies, eventually seeking out Kisco. Five key Verson officers visited Kisco's St. Louis plant on October 6, 1980. Verson's vice president for Systems Research, Ken Otsuka, determined that Kisco's experience could be helpful in preparing the bid package.

Robert Hoffman, Kisco's chief engineer, reported to Jerome Holden, Kisco's chairman, that Verson might be interested in securing Kisco's assistance. Holden called its legal counsel and requested that it prepare a "memorandum of understanding." This memorandum was prepared and delivered to Holden on October 10, 1980.

1. The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri.

On October 10, Otsuka and Donald Smith, another Verson vice president, met with Holden and Jack Brackbill, Kisco's vice president of marketing. They informed Holden and Brackbill that they wanted Kisco's help badly; Kisco responded that it wanted to be paid for its assistance and information. Brackbill stated that it would not cost much if Verson failed to get the contract, but that the price would be $250,000 if Verson were the successful bidder.

Otsuka discussed the $250,000 suggested fee with Verson's president, who agreed that it was reasonable and authorized Otsuka to negotiate the contract with Kisco. In discussions on October 13 and 14 between Otsuka and Holden, it was agreed that Verson would have access to Kisco's plant, data and technology in return for a fee of $250,000, $10,000 to be paid at the outset and an additional $240,000 to be paid if Verson won the Mason-Chamberlain contract. Otsuka told both Holden and Hoffman that they had a contract and should get started.

There is no dispute that Verson personnel were permitted to come to Kisco's plant the next day and that they began to gather a substantial amount of data. By November 14 they had obtained all, or very nearly all, of the information requested for preparation of the bid.

Hoffman had suggested that the agreement be reduced to writing before any information was turned over to Verson, but Otsuka protested that time was short. Hoffman and Holden testified that Verson would not have been let in the plant had the writing been essential. Otsuka testified, however, that Verson was to be given information during the pendency of negotiations absent a written agreement so that it would be able to prepare its bid in time to meet the deadline.

On October 15, 1980, Holden sent a draft of a memorandum of agreement to Verson. Walter Johnson, Verson's vice president of systems marketing, was assigned to analyze the draft. On October 22, having not been returned the agreement, Holden noted in his daybook that he needed a letter of intent. The next day Holden and Brackbill met with Johnson and stated that a signed letter of intent was required.

On October 27, Verson sent Kisco a revised memorandum of agreement that required Kisco to warrant that it had the right to furnish Verson the information it was selling and further to warrant that to Kisco's knowledge its process did not infringe upon any U.S. patents. The warranties were deemed material consideration for the contract.

On October 29, Holden determined that the requested warranties were too broad and refused to sign. He prepared yet another revised draft warranting only that Kisco had the right to make use of the "tooling and know-how" and that they belonged to Kisco. The draft also expressed an opinion that the "tooling and know-how" did not infringe one specific patent, but expressly made no warranty that they did not "infringe any patent." This revised draft was mailed on October 31 and received by Verson November 3.

On November 14, Verson informed Kisco that it would not enter into an agreement but would, and eventually did, pay Kisco $10,000 for its assistance to that date. Specifically, Smith told Holden that it was terminating the agreement because it had determined that Kisco's technology was neither innovative nor useful. Holden replied that Kisco would continue to make itself and its knowledge available and that it expected to be paid if Verson won the Mason-Chamberlain contract.

Verson was awarded the Mason-Chamberlain contract. The district court found that Verson independently designed its system and did not incorporate any portion of the Kisco system.

In its order the district court summarized the negotiations between the parties as follows:

> After arriving at the foregoing understanding, Holden and Otsuka agreed that a written contract covering all the terms deemed necessary would be prepared by

Holden and submitted to Verson for approval. It was further agreed that because of the time restraints creating an urgency as to phase one, Verson's personnel could continue their visits to the Kisco plant and obtain further background information while the parties were engaged in hammering out a definitive written agreement. Such a visit took place on October 15. It is obvious that as of that time and for several weeks thereafter neither party doubted that a written agreement would be arrived at and executed on mutually satisfactory terms.

*Kisco Co. v. Verson Allsteel Press Co.*, 564 F.Supp. 154, 156 (E.D.Mo.1983).

The district court further recognized that Mason-Chamberlain would require the successful bidder to indemnify it against liability for patent infringement. Thus, the warranties requested by Verson were of considerable significance. The district court discussed the added complication arising from the fact that the Kisco equipment had been manufactured by Waterbury-Farrell, one of Verson's competitors, and had been jointly developed using both Kisco's and Waterbury-Farrell's proprietary information. Their agreement stated that the equipment purchased by Kisco from Waterbury-Farrell was Kisco's property but that Waterbury-Farrell had the right to sell equipment that utilized a combination of Waterbury-Farrell and Kisco's proprietary fabrication information. The district court found, however, that "the language employed did not clearly, if at all, cover Kisco's right to sell the proprietary information *owned and utilized by Waterbury Farrell* in the manufacture of the process." *Id.* at 157 (emphasis in original).

The district court made the following findings concerning the question of whether a written contract had been contemplated by the parties:

Our examination of the facts in evidence and weighing the credibility of the witnesses has left us with the firm conviction that as of October 14, 1980 and until Verson terminated the negotiations, neither party intended to bind Verson to pay $250,000 absent a signed agreement in writing spelling out all the precise terms to which the parties were to be bound followed by a purchase order. That the parties did not then contemplate they would have any problem in drafting the writing does not alter our conclusion.

*Id.* at 158. The district court then pointed to particular evidence demonstrating Kisco's strong desire to have a written agreement. The district court found that the parties had orally agreed to the amount of compensation and the general nature of the assistance to be provided, but had not agreed to specifics, including the what, when and how of the items to be furnished, as well as Kisco's warranty of its right to sell its technology and its warranty of non-infringement. While these warranties were not of relevance as to the pre-bid phase, *i.e.*, "phase one," they "directly affected Verson's right to copy Kisco's process as it contemplated on phase two...." *Id.* The court further found that it was Kisco's reluctance to assent to the agreement with the requested warranty that ultimately led to the termination of the relationship. *Id.*

The district court proceeded to find that Verson had received far more information than called for in phase one and that the value of this information was $110,000, of which $10,000 had already been paid. *Id.* at 160. It also awarded Kisco interest dating from March 26, 1982, and costs.

I.

As a preliminary matter, we recognize that the contract was to be in two phases, one to provide information sufficient to submit the bid, and the second to provide information sufficient to perform the work. The contested issues in this case relate only to the existence of an enforceable contract as to phase two; Verson voluntarily paid the $10,000 called for in phase one.

Kisco contends that the district court erred in failing to find that there was an enforceable oral contract between the parties. Citing *Ralston Purina Co. v. Nabis-*

*co, Inc.,* 541 F.2d 679 (8th Cir.1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 744, 50 L.Ed.2d 755 (1977), and *Central Bag Co. v. W. Scott & Co.,* 647 S.W.2d 828 (Mo.App. 1983), it argues that the existence of the contract is, generally speaking, a matter of law for the court to decide. These cases do not support Kisco's position. "Whether parties become bound by oral agreements or only upon execution of writings is a question largely dependent upon intention. Judgment of credibility is peculiarly vital in connection with questions of intent." *First Nat'l Bank of Chicago v. Jefferson Mortgage Co.,* 576 F.2d 479, 488 (3d Cir.1978); *see Sawyer v. Arum,* 690 F.2d 590, 591–92 (6th Cir.1982).

In this case, the chief question for the district court's determination was the parties' intentions. "Determination of whether oral negotiations culminate into a present binding contract vel non depends upon the intentions of the parties." *Collins v. Swope,* 605 S.W.2d 538, 540 (Mo. App.1980); *see Priest v. Oehler,* 328 Mo. 590, 600–601, 41 S.W.2d 783, 787 (1931). In *Collins,* the court explained:

> "Intention" is a state of mind. Seldom are the intentions of parties capable of direct proof and, ordinarily, such intentions are determinable only through logical deduction from proven facts. The trier of the facts, be it court or jury, usually decides the question of intention. Albeit a party may testify regarding his intentions, if his testimony is contrary to other evidence it is of small value.

605 S.W.2d at 540.

We believe that the district court correctly viewed the evidence before it as creating a factual question as to whether the parties had intended to reduce their agreement to writing before being bound. The testimony of Kisco and Verson personnel was in direct conflict on this issue.

The Supreme Court has made clear that questions of intent are factual inquiries subject to the clearly erroneous standard set forth in Federal Rule of Civil Procedure 52(a). *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *see also Sawyer,* 690 F.2d at 591–92

(whether three separate documents were intended as single integral contract); *First Nat'l Bank of Chicago,* 576 F.2d at 488 (whether parties intended oral contract). A finding is clearly erroneous if, although there may be evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Pullman-Standard,* 456 U.S. at 284 n. 14, 102 S.Ct. at 1788 n. 14 (1982) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

In making its finding that the parties intended to be bound only by a written contract, the district court relied upon evidence as to Kisco's intention concerning the memorandum agreement and the letter of intent. In view of the significantly more complex issues involved in phase two of the agreement, the court was justified in concluding that a written agreement was necessary, that there had not been agreement on the warranties and indemnity for patent infringement, and that negotiations were still in progress. We believe that the findings of the district court that the parties had failed to agree to all of the essential terms, specifically some of the terms required by phase two, the nature and extent of the warranties, and the issue of patent infringement, were not clearly erroneous.

Relying on *Hunt v. Dallmeyer,* 517 S.W.2d 720, 729 (Mo.App.1974) and *Shapleigh Investment Co. v. Miller,* 193 S.W.2d 931, 937 (Mo.App.1946), Kisco argues that because the parties did not specifically indicate an intent not to be bound unless there was a signed writing, such a finding of intent was precluded. Kisco demonstrated that Verson never communicated to Kisco an intention not to be bound until there was a written contract. The *Hunt* and *Shapleigh* cases however, are inapplicable to the present case. Both involved a preliminary written agreement that indicated that a more formal document was to be signed later. As the court in *Shapleigh* explained:

> [I]t becomes a question of fact as to whether the parties intended the formal writing to be merely a memorial of their

agreement arrived at through their correspondence, or whether they intended that there should be no contract until the execution of the formal ... agreement.... We find that the parties ... reached an agreement sufficiently definite and clear in its terms to make a binding contract, and that they regarded the formal writing which they contemplated preparing merely as a memorial of their preliminary agreement, and not as necessary to the consummation of the contract.

193 S.W.2d at 937. Under such circumstances, legal effect was to be given the preliminary agreement unless the parties specifically indicated that the later writing was a necessity, rather than a formality. In the present case, no such preliminary agreement "sufficiently definite and clear" as to all the terms of phase two existed. The district court specifically found from evidence of the parties' actions that each intended not to be bound absent a signed writing, regardless of whether Verson communicated its intention to Kisco, and we have concluded that its findings were not clearly erroneous.

### II.

■ Kisco next contends that Verson is estopped to assert that a signed writing was a condition precedent to its obligation to pay the contract price because it induced Kisco to proceed without such a writing. Kisco also contends that Verson accepted the benefits of the bargain and is therefore estopped to challenge its existence. Kisco's estoppel arguments, however, presume the existence of an agreement. In the cases upon which Kisco relies, parties have been held estopped to avoid the obligations of an oral or written agreement already made if they induce the other party to perform or if they derive the benefits of the agreement. *See Dubail v. Medical West Bldg. Corp.*, 372 S.W.2d 128, 132–33 (Mo.1963) (written contract); *Priest v. Oehler, supra* (oral agreement); *Long v. Huffman*, 557 S.W.2d 911, 915–16 (Mo.App. 1977) (written restrictive covenant); *State ex rel. Goodman v. Regent Laundry Co.*, 196 Mo.App. 627, 190 S.W. 951 (1916) (writ-

ten contract). In light of our conclusion that the district court did not err in finding that there was never any oral agreement as to phase two because the parties did not intend to be bound absent a signed writing, Kisco's estoppel arguments must fail.

Contrary to Kisco's assertion that Verson induced it to proceed, the district court found that the parties had agreed that Kisco would furnish information to Verson while the contract was still being hammered out. Furthermore, Kisco's argument that Verson accepted the benefit of the bargain begs the question. The district court found that the "bargain" struck initially was but to supply limited phase one information while the parties negotiated the principal agreement as to phase two. As we concluded above, the findings of the district court were not clearly erroneous in light of the evidence on the entire record.

### III.

■ Verson contends that Kisco was not entitled to the $110,000 awarded by the district court on the quasi-contract theory while Kisco argues that it was entitled to $250,000. Verson essentially argues that it was Kisco's burden to prove damages, and that there was insufficient proof in the record to set the award at $110,000. Kisco counters by arguing that Verson received essentially everything it had set out to obtain when it initially agreed to the $250,000 figure: access to Kisco's technology. Non-use by Verson, it argues, is irrelevant to the benefit provided.

The district court examined this difficult question and concluded that the benefit provided to Verson was worth far more than the initial sum of $10,000:

[A]lthough the phase one assistance was of aid in the preparation of the Verson bid, it related to much more than that. Verson was enabled to determine not only what it should do and how it should do it, but also what it should *not* do, a determination it could not have made but for the information it received from Kisco.

564 F.Supp. at 160. Yet, the district court also found that the value was significantly

less than $250,000 because the benefit bestowed fell far short of what the parties had intended that price to cover. It pointed to testimony that Otsuka had proposed a downward adjustment of the $250,000 figure by $140,000 when Verson discovered that it could not use the Kisco process. The district court reasoned:

> Starting from the premise that $250,000 would have been reasonable had all the contemplated information been provided and utilized, and the fact that it was not nor could have been copied, and that Verson's cost was increased by some $140,000, we have concluded that the reasonable value ... is the sum of ONE HUNDRED TEN THOUSAND DOLLARS of which Ten Thousand Dollars has been paid.

*Id.* Observing that mathematical exactness could not be achieved, the district court nonetheless carefully weighed all the facts and circumstances in determining what amount of money would constitute fair and just compensation to Kisco. Our review of the evidence does not leave us with the definite and firm conviction that a mistake has been committed, hence the district court's findings in evaluating Kisco's quasi-contractual damages were not clearly erroneous.

## IV.

■ Verson contends that the district court erred in awarding prejudgment interest to Kisco. The award of prejudgment interest in a diversity action is determined by referring to the law of the state in which the cause of action arose. *Weitz Co. v. Mo-Kan Carpet, Inc.*, 723 F.2d 1382, 1387 (8th Cir.1983) (quoting *Bauer v. Uniroyal Tire Co.*, 630 F.2d 1287, 1290 (8th Cir.1980)); *Fremont Nat'l Bank v. Collateral Control Corp.*, 724 F.2d 1410, 1415 (8th Cir.1983). This Court has previously recognized that under Missouri law prejudgment interest may be awarded whenever the amount due is "liquidated, or, although not strictly liquidated, is readily ascertainable by reference to recognized standards." *St. Joseph Light & Power Co. v. Zurich Ins. Co.*, 698 F.2d 1351, 1355 (8th Cir.1983) (citing *Denton Constr. Co. v. Missouri State Highway Comm'n*, 454 S.W.2d 44, 59–60 (Mo.1970) and Mo.Rev. Stat. § 408.020 (Supp.1983)). Prejudgment interest may be awarded in an action in quantum meruit. *General Aggregate Corp. v. LaBrayere*, 666 S.W.2d 901, 909 (Mo.App.1984) (court points to evidence of reasonable value).

■ Here the district court awarded prejudgment interest running from March 26, 1982, on the quasi-contract damages without articulating its reasons for doing so. Its opinion does not reflect whether it determined such damages to be liquidated or readily ascertainable by reference to recognized standards. We believe that the district court should make further factual findings as to these issues. We therefore remand to the district court for further consideration of the issues underlying the award of prejudgment interest and whether, in light of the findings, such an award is appropriate.

We affirm the district court's award to Kisco of damages in quasi-contract. We must remand the case, however, for determination of whether prejudgment interest should be awarded in light of Missouri law.